## CURRIER v. LEBANON SLATE CO.

*Corporations—Purchasing in of shares—Reduction of capital.*

An insolvent corporation cannot purchase in a portion of its capital stock. Such a transaction would be in conflict with Gen. Stats., ch. 135, sec. 3.

A corporation, whose capital stock as fixed and limited has not been fully paid in, cannot relieve a delinquent stockholder from payment of assessments upon his stock by a purchase of the same, especially against the objection of another stockholder.

A corporation cannot reduce its capital stock, under the provisions of ch. 134, sec. 6, Gen. Stats., by purchasing the shares of any stockholder. In order that such reduction may operate justly to all the stockholders, each stockholder should be allowed to surrender such proportion of his stock as the amount of the proposed reduction bears to the whole amount of capital stock.

FROM GRAFTON CIRCUIT COURT.

IN EQUITY. Dorrance B. Currier, of Hanover, in behalf of himself and all other stockholders in the Lebanon Slate Company who may come in and join in the prosecution of this suit, complains against said company and Elisha P. Liscomb, of Lebanon, Joseph W. Cleveland, formerly of Lebanon, and Adna Storrs, of Hanover, and says that he is the owner of one hundred shares of the stock of the company, being one tenth of the whole number of shares ; that the company was incorporated by the legislature of the state of New Hampshire at the June session, 1866, with authority to carry on the business of mining slate, and other minerals of any description, in the towns of Lebanon and Hanover and their vicinity, and to prepare the same for the market, and with authority to fix the amount of capital stock, the par value of the shares, and adopt a code of by-laws ; that the grantees organized

under said charter, and, on October 12, 1866, voted that the capital stock of the corporation be fixed at one hundred thousand dollars, in one thousand shares of one hundred dollars each ; that upon these one thousand shares of stock, assessments were voted from time to time ; that real estate was purchased, a dam built on Mascoma river in Lebanon, a mill erected for the manufacture of slate in its different forms and for its different purposes, excavations made, and quarrying carried on for getting out the slate, more or less of which was manufactured at the mill and there sold, or sent thence to market ; that Liscomb has been the owner of five hundred shares of its capital stock—two hundred and fifty of said shares he owned on August 22, 1867 ; that on that date an assessment was voted by the company, upon each share of stock, of four dollars ; that on October 4, 1867, two hundred and fifty shares of the capital stock were sold at public auction for nonpayment of the assessment of four dollars per share, and were struck off to Liscomb, he being the highest bidder, at one dollar per share ; that the company, so far as the purposes for which it was set on foot were concerned, was not a success ; that on November 19, 1868, the company passed a vote " to authorize the treasurer to hire money for the use of the company ;" that on March 17, 1869, it was voted by the company " that the directors obtain three thousand dollars upon a permanent loan, in such sums as they may be able, and find necessary for the use of the company ; and they are hereby authorized to pledge any personal or real estate and machinery, by deed or deeds of mortgage, to any person or institution as security for the same ; " that on the same day, and at the same meeting, it was " voted that the directors may give a note for one thousand dollars, payable in one year from date ; " " also, another note for a like sum, after deducting what is due the company from Mr. Liscomb, on his transferring one hundred shares of his stock to the company ; " that, in pursuance of this vote, one hundred shares of the stock belonging to Liscomb were sold to the company at twenty dollars per share, and were transferred on the books of the company from Liscomb to the company—fifty shares on March 30, 1869, and fifty other shares on April 20, 1869 ; that said vote was carried through by the influence of Cleveland, acting for and on behalf of Liscomb, avowedly for the purpose of relieving him, who was, as stated by Cleveland, embarrassed by being obliged to carry so much of the stock of the company, and to pay the assessments on the same, and who was then owing the company eight hundred dollars or thereabouts for assessments theretofore laid upon his stock ; that said vote was carried through as a personal favor to Liscomb, and not with a view to any benefit or advantage to be derived by the company therefrom, but to relieve Liscomb from the burden of carrying so much of the capital stock of the company ; that said Cleveland and Storrs were stockholders, and were present at said meeting, and voted in favor of said purchase ; that the plaintiff opposed the proposition that the company should take said one hundred shares from Liscomb at any price, and, after strenuously objecting and protesting against taking or passing any such vote by the company,

left the room where said meeting was held before the vote was taken to purchase said stock ; that he objected on the ground that the company was in debt, and maintained that such a transaction was not only illegal, but unjust, and that he would resist and oppose it to the end ; that the stock, at the time the above votes were passed, had no marketable value, and could not have been sold ; that for said one hundred shares two notes were given by said company to said Liscomb—one for one thousand dollars, now in his hands, and one for six hundred dollars or thereabouts, in the hands of said Storrs—who took it, being well aware, at the time, of all the circumstances attending the giving of the note, and the consideration therefor :—by means of all which the plaintiff says he has been greatly damnified, as well as said Lebanon Slate Company, his property in said company being diminished greatly in value by the aforesaid purchase and transfer of stock from Liscomb to said company, and by the aforesaid notes held by Liscomb and Storrs, and now outstanding against the company ; and the stock of the plaintiff, as well as the property of the company, will be still further depreciated if the payment of said notes should be enforced against the company.

The prayer of the bill is, that said stock may be decreed and ordered to be retransferred to Liscomb, or to Liscomb and Storrs, and that the notes given therefor may be decreed null and void, and be cancelled and given up ;—and, further, that said company may be enjoined from paying said notes ; that said Liscomb, Cleveland, and Storrs be enjoined against negotiating or transferring said notes, and from attempting to collect the same, and ordering and commanding them to cancel and give up said notes upon the retransfer or a tender of a retransfer of said stock, and for other relief.

Storrs filed an answer, admitting that he was a stockholder in said company ; that he was present at the meeting when it was voted to purchase said one hundred shares of said Liscomb, and authorize the officers to give the notes of the company therefor. He claims that it was a " legitimate transaction," and admits that a few weeks afterwards he purchased of Liscomb the note for $600, in good faith, paying the full amount therefor, and that he still holds the same.

Liscomb, for himself, and as agent of the company, answered, admitting that the company has not been a success ; that, pursuant to said votes, the company purchased one hundred shares of his stock, but denied that it was done as a personal favor to him and not with a view to benefit the company; or that he was then owing the company $800 for assessments then due ; or that the plaintiff objected to the purchase of said stock ; or that the stock was of no marketable value and could not be sold ;—he averred that the known debts of the company did not at that time exceed $750, of which $500 was for plaster then in store ; that at that time they owned one hundred acres of land, including one of the best water-powers in the county, and a valuable mill and machinery, with prospects for a large and profitable business ; that the prospects then were more favorable than ever before ; that no

stockholder would at that time have sold his stock at less than $20 per share, being the amount of assessments then paid in ; that said Liscomb, being treasurer of the company, bid off two hundred and fifty shares of the stock, sold for non-payment of the first assessment of $4 per share, at $1 per share, for the benefit of the company, after consulting with some of the stockholders, paying the company $3 per share in addition to the price at which he bid them off, which was the full amount of the assessments to that date; that unless he had done this the company would have been embarrassed, as no outside parties appeared at the sale ; that the vote, sale, and transfer of said one hundred shares to the company was in good faith, and for the interest of the company ; that the plaintiff's interests were not lessened thereby ; that the plaintiff made no objection to the sale and transfer, " save a certain amount of habitual grumbling ; " that his stock did not depreciate nor the prospects of the company look unfavorable until some months afterwards, when defects in the quarry were discovered, and plastic slate as a roofing material proved a failure ; and that at the time of the transfer said Liscomb was solvent.

Cleveland did not answer.

The cause was referred to a master, who reported that at the time the Lebanon Slate Company voted to purchase the one hundred shares of Liscomb's stock at $20 a share, there had been no sale of the stock in open market, and that no dividend had been declared ; that at the time of the vote, Liscomb was owing the company something over $100 on assessments previously made on his stock ; that the company was then indebted to various persons to the amount of about $800, also on a small note, amount not ascertained ; that there appears also to have existed at that time, though unknown to the parties, a mistake of $1,000 in Liscomb's report, as treasurer in 1868, in favor of the company ; that including this $1,000, the indebtedness of the company, March 17, 1869, was somewhere over $1,800. He also finds that at the meeting at which the vote was taken to purchase said one hundred shares of Liscomb's stock, Cleveland, who then had charge of the company's works, represented to the meeting that Mr. Liscomb had more stock than he was able to pay the assessments on, and wished the company to take a portion of his stock, and give him notes for the same, at $20 a share ; Cleveland also represented, that unless Mr. Liscomb could have some relief he would be unable to pay his assessments, and that the company would be obliged to stop their works or hire money to carry them on ; he also represented that Liscomb would then be enabled to raise money on the notes he would receive from the company to pay the assessments on his remaining stock. At the meeting of the company, March 17, 1869, the plaintiff objected to the company's purchasing the one hundred shares of Liscomb's stock ; that at the time of the vote to purchase the one hundred shares of Liscomb, the market for concrete had failed, and that for ground slate began to fail materially in the spring of 1869 ; but it did not appear whether it was before or after the time of the vote,

March 17, 1869. In other respects the affairs of the company were as prosperous, apparently, as they had been.

The master finds that there were observed seams of quartz running across the face of the ledge from the beginning of the operations of the company, or as early as July, 1868, and that there was more in sight then than in the fall of 1868, when the quarry presented nearly a perpendicular face about thirty feet high, and from twenty to thirty feet in breadth. One vein of quartz ran through it about four inches thick, nearly on the upper edge of this face, across the grain of the slate ; they also ran upon a bed seam at the bottom of the excavation ; there were also two seams running across the grain nearly at right angles to the quartz vein. In the fall of 1868 the slate was not as good as it had been, but the company expected it would improve as they went in. From January to June, 1869, the company were engaged in grinding slate and plaster, getting out flagging, manufacturing, to some extent, sinks, water-boxes, and gravestones, and marbleizing slate. In April they put in a rubber bed and a drill machine, at an expense of about $1,000. In June they came to a hard and warped material in the quarry that had apparently been heated, and the slate thus being unsuitable for marbleizing, they suspended work at the quarry. In all these months they shipped ground slate, barrelling it up and sending it off.

The master finds that, of the articles manufactured by the company, the market for ground slate began to fail materially in the spring of 1869, and that the market for concrete failed in the fall before, and the marbleizing of slate failed, on account of the discovery of the hard and warped condition of the slate in the quarry, in June, 1869.

The master finds that the reasons why the company is not now in operation are, that the quarry failed to produce a good article of slate, the failure being especially manifest in June, 1869 ; and the losing the sale of ground slate by the failure of the plastic roof slating, for which it was extensively used. There was a concrete for which a patent was taken out, and the use of this failed up. The company also lost the sale of ground slate for oil-cloth, for which it was extensively used, by the substitution of another article.

He finds that Liscomb, upon the sale of the personal property of the company, received between $4,000 and $5,000, and paid it out for the liabilities of the company ; and that Liscomb testified that he did not think he had paid out anything on liabilities against the company existing prior to March 17, 1869.

He finds that the accounts of the company were kept very imperfectly ; that neither Liscomb nor Cleveland can give an exact account of the company's indebtedness March 17, 1869, or of what it now owes.

There was evidence showing that at the meeting of the company, March 17, 1869, Cleveland reported that Liscomb was owing the company $800, or thereabouts, and could not carry as much stock as he then had.

Since March 17, 1869, a claim is made against the company by Lis-

comb for money advanced in the fall of 1867 to pay for stock sold to pay assessments ; he bid off the stock—two hundred and fifty shares— at $1 per share, and paid the assessments, $3 per share, thus creating a debt of $1,000 against the company, as now claimed. The real estate of the company has been in the market since 1870, at $4,500. There has been no final settlement of the affairs of the company.

The master finds that neither Cleveland nor Liscomb, whether acting as general manager, or agent, or treasurer, or clerk, can give an exact or accurate account of the business of the company.

The questions arising on the master's report were transferred to this court by LADD, J.

*Duncan* (with whom was *H. Bingham*), for the plaintiff.

*Spring*, for the defendants.

SMITH, J. 1. The vote of March 17, 1869, authorizing the directors to give the notes of the corporation to the amount of $2,000, upon receiving from Liscomb a transfer of one hundred shares of his stock, was in effect a vote to release him from his subscription for so many shares, and to refund to him the amount he had paid thereon. The reason assigned to the stockholders why this should be done was, that he had more stock than he was able to pay for, and, unless he could have relief in some way, the company would be obliged to stop their works, or hire money to carry them on. It was further represented, that he would thus be enabled to raise money on the notes of the company, with which to pay the assessments on his remaining stock. It is not claimed by the defendants that the corporation intended, or that the effect of the note was, to reduce the amount of the capital stock, or to extinguish the one-hundred shares transferred by Liscomb ; but they claim that the corporation hold the shares so transferred as property, with power to reissue the same to any subscriber or purchaser thereof.

It distinctly appears that the whole amount of the capital stock, as fixed and limited by the corporation, has never been paid in. It is certain, therefore, that prior to March 17, 1869, the directors and treasurer could not make and subscribe a certificate under oath that the amount of the capital stock had been fully paid in, and cause the same to be recorded in the office of the clerk of the town where the corporation had its principal place of business, as required by chapter 135, section 20, General Statutes. Under section 8 of the same chapter, therefore, the stockholders were individually liable for all the debts and contracts of the corporation.

It is not distinctly found in the master's report whether the corporation, on March 17, 1869, had sufficient assets to meet all its liabilities. If it had not, the vote in question would be clearly illegal, and what has been done under it should be set aside. The funds of an insolvent corporation cannot be taken to buy in a portion of its capital stock at the expense of its remaining stockholders. It would be grossly in-

equitable to the other stockholders, and a fraud upon the creditors. Moreover, it is prohibited by ch. 135, sec. 3, Gen. Stats., which provides that no dividend shall be made, and no part of the capital stock shall be withdrawn or refunded to any of the stockholders, when the property of the corporation is insufficient, or will be thereby rendered insufficient, for the payment of all its debts ; and by section 7 it is provided that any stockholder who shall receive any sum unlawfully withdrawn or refunded from the capital stock, shall, to the amount by him received, be·individually liable for all the debts of the corporation then existing, or afterwards contracted, until the same is repaid, or paid to the creditors of the corporation.

2. But, assuming that this corporation, on March 17, 1869, was solvent, it becomes material to inquire whether the corporation could lawfully purchase of Liscomb one hundred shares of its capital stock, the assessments upon which he had been unable to meet.

In *Salem Mill Dam Corporation* v. *Ropes*, 6 Pick. 23, it is laid down that "no vote or act of a corporation can enlarge its chartered authority, either as to the subjects on which it is intended to operate, or the persons or property of the corporators. If created with a fund limited by the act, it cannot enlarge or diminish that fund but by license from the legislature, and if the capital stock is parcelled out into a fixed number of shares, this number cannot be changed by the corporation itself. *Vide* 1 Dane's Abr., ch. 22, art. 1, and the numerous authorities cited by the author."

In *City Bank of Columbus* v. *Bruce*, 17 N. Y. 507, it appears that the Columbus Insurance Co., being in full operation, with a capital of $300,000 (the amount authorized by its charter), voted, through its board of directors, that any stockholder indebted to the company on stock notes might have the privilege of paying any part or all of such indebtedness in the capital stock of the company, at a rate specified in the resolution. Under this authority stock was surrendered or transferred to the company in payment of notes, to the amount of $133,000. SELDEN, J., in delivering the opinion of the court, says,—"There seems to be no ground for questioning the validity of this transaction. I am not aware of any common-law principle which forbids it, nor is it shown to have been in contravention of any provision of the charter of the company, or any other of the statutes of Ohio. In the case of *Taylor* v. *The Miami Exporting Company*, 6 Ohio 83, it was held that a bank might receive its own stock in payment of a debt, and might hold it as it did its other corporate property."

I am not prepared to say that under the laws of this state a solvent corporation may not, in good faith, and for the purpose of securing payment of ·a debt against a stockholder, which might not otherwise be collected without risk, delay, and expense, receive its own stock in payment therefor at its fair value, and hold the same as property ; in which case it would not become extinguished, and might be reissued to the purchaser thereof. But this case differs widely from such a

case. The object of the vote in question appears to have been, or was declared to be, not to collect a debt due to the corporation, but to afford relief to a stockholder by taking off his hands stock for which he had partially paid, but for which he was unable to complete the payments. This was done by hiring money for the purpose, or rather by giving him the notes of the corporation to be negotiated by him, and ultimately paid by the company, and against the protest of the plaintiff. It is difficult to see how the welfare of the corporation could be promoted by hiring money, or incurring further liabilities, to purchase in one tenth of its capital stock, for which there had been no sale in the open market, and upon which no dividend had ever been declared, and for which it was extremely doubtful whether another purchaser could be found, unless the affairs of the company should improve (a condition which appearances then hardly warranted). The inevitable result was to release Liscomb from paying into the treasury of the company the balance of the assessments then made, or to which the stock was liable, amounting to $8,000.

It further appears from the report of the master that two hundred and fifty shares of stock were sold by the company for non-payment of an assessment. The defendant—Liscomb—admits that he bid this off at $1 per share, and paid to the company the balance of the assessment, $3. He says this was done after consulting some of the stockholders, but he does not claim that he had any legal authority to buy it for the company. The reason that he assigns,—that unless he had done this the company would have been embarrassed, as no outside parties were present at the sale,—shows that the stock had little if any value at the time. By the report of the master it also appears that Liscomb has, since March 17, 1869, claimed to recover the sum of $1,000 so paid by him. It is not material to inquire upon what ground such a claim can be based. That question does not arise here, and the transaction is important only as bearing on the value of the stock, and the value of the stock is material as bearing upon the good faith with which the purchase by the company of the one hundred shares, October 17, 1869, was made.

If Liscomb was unable or unwilling to pay the assessments levied upon his stock, the statute afforded a remedy which the corporation was bound to pursue. A suit could undoubtedly have been maintained against him to collect the assessments; or under secs. 16 and 17 of ch. 134, Gen. Stats., the treasurer could proceed to advertise and sell the shares, or so many of them as might be necessary to pay the assessments then due, with necessary charges. If the stock had any value, it is fair to presume it would have sold for what it was worth, or for a price approximating to it. If the transaction, by which the company bought one hundred shares of its stock at $20 per share, was an honest transaction, the stock if sold in the market would undoubtedly have brought that sum, or somewhere near it. If it would not, it affords very strong evidence of collusion between Liscomb and a majority of the stockholders, by which this plaintiff cannot be bound, especially in the face of his protest seasonably made.

The plaintiff charges such constructive fraud as courts of equity recognize, and for which they set aside engagements. The action of the company relieved Mr. Liscomb from his contract to pay the overdue assessments upon one hundred shares of stock, but it involved the company in a further debt of $2,000 for one hundred shares of stock for which the company had no use, and which it is fair to presume others would have bought if they had possessed any value. The assets of the company were thus withdrawn, and appropriated to an unlawful purpose, and at the same time the indebtedness of the company was increased. All this was done at the expense of the other stockholders, without the consent of the plaintiff, and against his protest. It seems clear to me that he has the right to call upon the court to interfere and prevent this wrong, and to restore matters, as far as may be done, to the condition in which they stood at that time.

3. By section 3 of the charter of this corporation, the shareholders were authorized to fix the amount of the capital stock not exceeding $200,000, and the par value of the shares. Accordingly, at the meeting of October 12, 1866, the capital was fixed at $100,000, in one thousand shares of $100 each. Did the action of the meeting of March 17, 1869, have the effect to reduce the capital stock as thus fixed and determined, and had the corporation power to reduce the capital stock in the manner then adopted?

By Gen. Stats., ch. 134, sec. 6, it is provided that a "corporation, at any meeting called for the purpose, may increase or reduce its capital stock and the number of shares therein; but the capital stock when so increased shall not exceed the amount authorized by law." This section purports to be a reënactment of section 9, chapter 141, Revised Statutes, which reads thus: "Every such company may, at any meeting called for that purpose, increase its capital stock and the number of shares therein, provided that the stock when so increased shall not exceed the amount authorized by law." It will thus be observed that the power of a corporation to reduce its capital stock, as found in the General Statutes, is new. Section 7 of the same chapter (which is a reënactment of the statute of 1855) provides that a corporation may by unanimous vote, or by the written consent of all the stockholders filed with the clerk, increase or diminish the number of its shares, and thereby increase or diminish the par value of its shares; but the capital stock shall not thereby be increased or diminished. At first view these two sections seem to be in conflict; but upon closer inspection it is apparent that the 7th section was intended to provide a mode by which the par value of shares may be diminished or increased, as a matter of convenience merely, without changing the amount of the capital stock; while the 6th section provides for increasing or diminishing the amount of the capital stock, as previously fixed and determined by the charter of the corporation or by vote of its members, whenever the circumstances or wants of the company may require a larger or smaller capital for carrying on its works profitably. If the corporation desires to increase its capital, this may be done by the

issue of new shares, or by increasing the par value of the old. If it desires to diminish its capital stock, that may be done by refunding to its stockholders a definite portion of each share, or by the surrender and extinguishment of the requisite number of shares. But how this shall be accomplished when none are willing to surrender, or when all are anxious to surrender, it is not easy to determine. It cannot certainly be at the expense and against the consent of one portion of the stockholders, and for the benefit and advantage of the others. The statute ought not to be construed to work other than exact and even justice to all the share-owners. In *Bank* v. *Bruce* it was held that whether a purchase by a corporation of its own stock operates to diminish the capital stock, is a question of intention ; and this may be inferred from circumstances. In this case, as I understand the position of the defendants, it is not claimed that the stock purchased by the corporation of Liscomb has been extinguished, but is held to be reissued whenever a purchaser for it can be obtained. However this may be, I do not think a corporation has the power, under chapter 134, section 6, to diminish its capital stock by the purchase and extinguishment of a portion of its shares, without the consent and against the protest of any of its stockholders, when such purchase and extinguishment would operate for the relief and benefit of the stockholders from whom the stock is purchased, and will increase the liability of the remaining stockholders. Unless a course is adopted which will work exact and even justice to all the owners of stock, it must follow that so much of section 6 as authorizes a corporation to diminish its capital stock, by the purchase and extinguishment of a portion of its shares, is inoperative. Probably a vote allowing each stockholder to surrender such proportion of the shares owned by him as the amount of the proposed reduction in the capital stock bears to the whole amount of capital stock, would not be open to objection, but would be a compliance with the requirements of the statute ;—but that was not the course pursued here. My conclusion then is, that the action of the company, March 17, 1869, could not operate to diminish its capital stock.

The evidence shows that Adna Storrs was present at the meeting held March 17, 1869, and therefore knew the illegal nature of the consideration of the note for $600 transferred to him by Liscomb. A decree should be entered in the circuit court, that Liscomb and Storrs be enjoined from collecting or negotiating the note for $1,000 and the note for $600 ; that they refund to the corporation all moneys received from the corporation, by either of them, on said notes, with interest from the time of such payments ; that the company reconvey to Liscomb said one hundred shares of stock ; and that the contract, by which Liscomb was released from payment of any sum or sums due from him to the company at the date of the purchase of said stock by said company, be annulled and set aside.

CUSHING, C. J., and LADD, J., concurred.

*Decree accordingly.*