LESTER MARTIN, SYLVIA MARTIN, SAMUEL MARTIN and LESTER MARTIN & Co., INC., a corporation of the State of New York, Plaintiffs below, Appellants,

*vs.*

AMERICAN POTASH & CHEMICAL CORPORATION, a corporation of the State of Delaware, Defendant below, Appellee.

*Supreme Court, On Appeal, October 30, 1952.*

Southerland, C. J., and Wolcott and Tunnell, JJ., sitting.

*Daniel O. Hastings* and *Ayres J. Stockly*, of Hastings, Stockly & Walz, *(William Gellin*, of New York City, on the brief), for plaintiffs below, appellants.

*Edwin D. Steel, Jr.*, and *William S. Megonigal, Jr.*, of Morris, Steel, Nichols & Arsht, (Oliver & Donnally, of New York City, on the brief), for defendant below, appellee.

SOUTHERLAND, Chief Justice, delivering the opinion of the court:

The essential question presented is whether a purchase by a Delaware corporation of its own shares at private sale for retirement may be lawfully made without a pro rata offering to all holders of the class or classes of stock purchased.

The facts are these:

American Potash & Chemical Corporation (herein "defendant") is and for many years has been engaged in the manufacture and sale of potash and other industrial and agricultural chemicals, with properties situated on the edge of Searles Lake, a "dry" lake at or near Trona, California. As of the time of the transaction here reviewed it had outstanding, in addition to an issue of preferred stock, 48,664 shares of Class A common stock and 479,726 shares of Class B common stock. Of the common stock 2,575 shares of Class A and 134,650 shares of Class B were owned by Mathieson Chemical Corporation (herein "Mathieson"), a company engaged in a like business. These holdings appear to have been the only large block of shares singly held. Mathieson had purchased these shares (or the greater part of them) with a view to bringing about a merger of defendant and Mathieson. In the fall of 1951 negotiations were had between the officers of Mathieson and defendant with respect to a possible merger, but Mathieson's proposed terms were unsatisfactory to defendant. Counter proposals to Mathieson were rejected by it, and the matter was dropped. Discussions were reopened in April of 1952. Another merger proposal was made by Mathieson to defendant, was considered by defendant's directors at a board meeting on May 15, 1952, and was likewise rejected.

In the interim between the lapsing of negotiations in the fall of 1951 and the final proposal in 1952, Mathieson had indicated its intention to dispose of its holdings in defendant if no merger could be effected and had taken preliminary steps to that end before the Securities and Exchange Commission. During this time

the relations between the two companies were not harmonious. Five of the twelve members of defendant's board were nominees of Mathieson, and apparently did not share the views of the majority on certain questions of corporate policy. In the spring of 1952 the defendant's management concluded that it was to the interest of the company to eliminate the block of shares held by Mathieson. Believing that a public distribution of the shares was not feasible, it determined to make an offer to purchase the shares for retirement. This offer resulted in an agreement dated June 5, 1952, providing for the purchase by defendant from Mathieson of 2,575 shares of Class A stock and 117,425 shares of Class B stock at the price of $40 a share. The shares were to be purchased for retirement under *Section* 28 of the *General Corporation Law*, and the purchase was subject to approval of defendant's stockholders at a special meeting of the holders of the A and B stock to be held on July 10, 1952. Concurrently with this contract, and dependent on the consummation thereof, the firm of Lehman Brothers, of New York, agreed to buy for its own account and for the account of others the remaining Class B shares of defendant owned by Mathieson. On June 9 notice was given of the stockholders' meeting, at which the stockholders were to vote upon the terms of the proposed purchase, the retirement of the stock, and the consequent reduction of capital; and on June 24 plaintiffs filed their complaint below, seeking to enjoin the meeting or, alternatively, to enjoin the consummation of the contract.

Plaintiffs' application for a restraining order was heard by the Vice Chancellor on July 2 upon the verified complaint and answer and affidavits filed by defendant. On July 10 he entered an order denying the application. Thereafter on the same day the stockholders of defendant met and approved the purchase. Of the shares voted (excluding the Mathieson shares) less than three percent were voted in opposition. No stay at that time having been sought or granted, the transaction was fully consummated on the same day and the required certificate of reduction was filed and recorded. On July 11, 1952, plaintiffs appealed to this court.

In substance two contentions are made: first, that the proposed purchase at private sale is illegal under *Section* 28 of the *General*

*Corporation Law, Rev.Code* 1935, § 2060; and second, that even if power to make the purchase exists it has been inequitably exercised in this case.

Before the merits are reached, however, a preliminary motion requires consideration. Defendant has moved to dismiss the appeal, urging (a) that the interlocutory order of the Vice Chancellor is not an appealable one under *Art.* IV, *Sec.* 11(4) of our *Constitution*, and (b) that because of the consummation of the transaction the appeal from the refusal of the restraining order is now moot.

■■ It is settled Delaware law that the interlocutory orders in Chancery which are by the Constitution made appealable are those, and only those, which determine substantial issues and establish legal rights. *Du Pont v. Du Pont,* 32 *Del.Ch.* 405, 82 *A.2d* 376; *Electrical Research Products, Inc. v. Vitaphone Corporation,* 20 *Del.Ch.* 417, 171 *A.* 738. No appeal lies from an order in Chancery which is discretionary and preliminary, intended merely to preserve the status quo, and not determinative of substantive rights. *Consolidated Film Industries v. Johnson,* 21 *Del.Ch.* 417, 192 *A.* 603.

■ Defendant says that the order here appealed from falls within the latter category. We think not. It is an order refusing injunctive relief—not one granting such relief to preserve the *status quo,* as in the *Consolidated Film case, supra.* Moreover, its necessary import is a determination by the court below of the important question of law presented to it, viz., whether a purchase of shares under the facts presented is within the power granted by *Section* 28. This is so because if such power was lacking the court was bound to issue the restraining order. Hence the order was not of that type of discretionary order mentioned in the *Consolidated Film* case. We think that the denial of relief in these circumstances "has determined initially a substantial legal issue of the cause." *Du Pont v. Du Pont, supra* [32 *Del.Ch.* 409, 82 *A.2d* 379.] We do not say that all orders refusing preliminary injunctive relief are appealable; but we hold that the order in this case, which necessarily determined the main question of law against the plaintiffs, is an appealable order.

Of no substance, we think, is the argument that the plaintiffs' status as stockholders qualified to maintain the suit was put in issue and that until the determination of that issue no legal principle could be decided. The remarks of Judge Harrington upon this point in the *Consolidated Film* case, *supra*, must be read in the light of the order that he was reviewing which was, as above noted, an order granting a preliminary injunction to preserve the status quo.

Nor do we think that the appeal presents a moot question. Defendant's argument is that the consummation of the purchase has rendered equitable relief impossible because the transaction cannot be rescinded. Even if this be true, it does not follow that plaintiffs might not be entitled to monetary relief if the transaction were unlawful. It is not necessary to pass on this question; we merely say that it does not plainly appear that the "controversy has come to an end." *Cf. Southern Production Co. v. Sabath*, 32 *Del.Ch.* 497, 87 *A.2d* 128; *State ex rel. Traub v. Brown*, 9 *W.W.Harr.* (39 *Del.*) 187, 197 *A.* 478. Defendant replies that even if the cause below is not moot, the appeal before us is so, since the propriety of granting injunctive relief is the sole question raised by· this appeal. We think the distinction too shadowy to justify the argument. To accept it would be to require another appeal, after final hearing, in order to pass upon the essential question of law—a course which defendant's counsel frankly concedes to be undesirable. Moreover, as the record now stands, defendant is in a position to assert, in any action which plaintiffs might bring against the directors in a foreign jurisdiction, that the Court of Chancery of this state has implicitly placed upon *Section* 28 of the *General Corporation Law* a construction which, though not embodied in a final judgment and hence not *res judicata*, might effectively bar the action. *Cf. North Laramie Land Co. v. Hoffman*, 28 *Wyo.* 183, 201 *P.* 1022; *Green v. Okanogan County*, 60 *Wash.* 309, 111 *P.* 226, 114 *P.* 457. If the question of law has been erroneously decided, plaintiffs' ·rights have been prejudiced. The appeal is not moot.

The motion to dismiss is denied; and we turn to the merits.

I.  Was the transaction *ultra vires?*

*Section* 28 of the *General Corporation Law*, 1935 *Rev.Code*, *Par.* 2060, as amended, confers upon a corporation power to reduce its capital and affords a choice of numerous methods to accomplish the reduction. Some methods permit the directors and the majority stockholders to effect a reduction against the will of a dissentient, e. g., "by drawing the necessary number of outstanding shares of any class by lot for retirement". Other methods contemplate a voluntary exchange or sale by individual stockholders; and it is with one of such methods that we are here concerned. The pertinent provisions of the statute are as follows:

"Such reduction of the capital of the corporation may be effected * * * by the purchase of shares for retirement, either pro rata from all holders of shares of that class of stock or by purchasing such shares from time to time in the open market or at private sale in both cases at not exceeding such price or prices as may be fixed or approved by the stockholders entitled to vote upon the reduction of capital to be effected in that manner, * * *."

In the instant case the corporation elected to proceed under that provision of the quoted statute permitting a reduction of capital by the purchase of shares for retirement "by purchasing such shares * * * at private sale." The purchase here attacked is clearly within the language of the statute, read literally. Plaintiffs insist, however, and earnestly press the argument, that there must be read into the phrase "at private sale" an implied limitation or requirement that any such purchase must be made pro rata, that is, that the opportunity to sell a pro rata portion of his holdings must be afforded to every holder of the class of stock the shares of which are to be purchased. Only so, say the plaintiffs, can there be preserved to the individual shareholders that right of uniform treatment which a court of equity should be zealous to protect.

The difficulty with this contention is that to accept it is to render meaningless the specific phrase "at private sale". This conclusion follows from these considerations:

The existing provisions of *Section* 28 here pertinent stem from the Act of March 2, 1927, *Vol.* 35, *Laws of Del.*, *Ch.* 85. Prior to 1927 the language of the section relating to the purchase of shares

for retirement was most general in its nature, the statute merely declaring that a decrease of capital stock might be effected "by the purchase at not above par of certain shares for retirement". 1915 *Rev.Code, Par.* 1942. This language appears to be identical with a provision in *Section 29* of the *New Jersey Corporation Act of* 1896.[1] In purchasing shares under this statutory authority the Court of Errors and Appeals of New Jersey held that the corporation was required to purchase pro rata, that is, to offer each stockholder of the class affected an opportunity to sell his stock at the price fixed. *Berger v. U. S. Steel Corp.*, 63 *N.J.Eq.* 809, 53 *A.* 68; *General Investment Co. v. American Hide & Leather Co.*, 98 *N.J.Eq.* 326, 129 *A.* 244. In 1926 the New Jersey act was amended so as to specify the methods of purchasing shares for retirement, and in 1927 the Delaware statute was amended to accomplish the same purpose. But whereas the New Jersey amendatory act specified only two methods of purchasing shares for retirement, viz., (1) a pro rata purchase from all holders of the class affected, or (2) purchase in the open market, the Delaware amendment of 1927 added a third method, viz., a purchase "at private sale".[2]

Now it is obvious that if the employment of the third method requires a pro rata offering, the added language serves no purpose, since the third method would then be the equivalent of the first. It is elementary that in construing a statute every clause must be given effect, *Southern Production Co. v. Sabath, supra*, and plaintiffs' proposed construction of *Section 28* would render the phrase "at private sale" superfluous and meaningless. Such a construction is therefore unacceptable. We must give effect to the clear legislative intent that, in addition to the first two methods of purchase, i. e., by pro rata offerings and by open-market purchases, a third and different method is permitted, i. e.,

[1] 2 *Comp.Stat. of New Jersey*, 1910, *p.* 1616, N.J.S.A. 14:11–5.

[2] The New Jersey amendment of 1926 reads in part:

"The decrease of capital stock or of capital may be effected by * * * the purchase of shares for retirement, either pro rata from all holders of shares of that class of stock or from time to time by purchase in the open market at not exceeding such price or prices as are fixed or approved by the stockholders entitled to vote upon the decrease to be effected in that manner". *P.L.*1926, *c.* 318, *Sec.* 8.

by private purchase negotiated directly with one or more shareholders willing to sell, without any pro rata offering. No other conclusion, we think, is permissible.

We have adverted to the history of the present *Section* 28 of our statute and of the comparable New Jersey statute because plaintiffs have cited to us four decisions of the New Jersey courts since the enactment of the 1926 amendment holding that purchases by a corporation of its own stock for retirement must be made ratably from the stockholders. See *Ocean City Title & Trust Co. v. Strand Properties, Inc.*, 106 *N.J.Eq.* 25, 149 *A.* 817; *Downs v. Jersey Central Power & Light Co.*, 115 *N.J.Eq.* 448, 171 *A.* 306; *Iback v. Elevator Supplies Co., Inc.*, 118 *N.J.Eq.* 90, 177 *A.* 458; *King Machine Co. v. Caporaso*, 2 *N.J.Super.* 230, 63 *A.2d* 270. Our courts have long recognized that our *General Corporation Law of* 1899 was modeled after the then existing New Jersey act, *Wilmington City Rwy. Co. v. Peoples Rwy. Co., (Del.Ch.)*, 47 *A.* 245, and decisions of the courts of that state are persuasive in construing a section of our statute drawn from the New Jersey law. But it is likewise true that "a departure by the adopting state from the phraseology employed in the model indicates a difference in legislative intent." *Chicago Corp. v. Munds*, 20 *Del.Ch.* 142, 172 *A.* 452, 454. Here the legislative intent to go beyond the scope of the New Jersey statute is clear. Hence none of the four New Jersey decisions above cited, which involved private sales not authorized by the statute of that state, is in point here.

The same comment is applicable to the other authorities relied on by plaintiffs. In none of the cases cited in support of the quoted texts[3] or upon plaintiffs' brief was there presented to the courts for construction a statute expressly authorizing a corporation to reduce its capital by the purchase of shares at private sale for retirement. Upon this ground (and as to some of them, upon other grounds as well) the following cases are clearly distinguishable: *Theis v. Durr*, 125 *Wis.* 651, 104 *N.W.* 985, 1 *L.R.A.*, (*N.S.*), 571; *Currier v. Slate Co.*, 56 *N.H.* 262; *Niagara Shoe Co. v. Tobey*, 71 *Ill.App.* 250; *Gill v. Balis*, 72 *Mo.* 424.

[3] 2 *Clark & Marshall, Pvt. Corp'ns, p.* 1298; 5 *Thompson, Corp'ns, Secs.* 3686, 3689, 3697; *Fletcher, Corp'ns, Sec.* 5149.

Plaintiffs' argument that a requirement of equality of treatment among stockholders should be read into the act meets a further difficulty in the matter of open-market purchases. We understand plaintiffs' counsel to concede that such purchases cannot be made pro rata; at all events it is clear that this is so. No implied requirement of equal treatment can be read into that provision of the section permitting open-market purchases; and hence no inference can be drawn of a general legislative policy to insure equal treatment among stockholders in all purchases of stock for retirement. The research of able counsel has failed to disclose any authority in this country directly in point (possibly the provisions of our statute are in this one respect unique), but our conclusion finds support in the decision of the House of Lords in *British and American Trustee and Finance Corporation v. Couper*, [1894] *A.C.* 399. In that case it appeared that the company did business both in England and the United States, the American investments and business being managed by a committee of the board resident in the United States. Dissension developed between the English board and the American committee, resulting in an agreement between the company and its American stockholders to apply a part of the capital assets of the company to the purchase and extinction of the American-held shares. No other stockholders were afforded the opportunity to sell their shares. Petition for approval of the reduction was filed in the Chancery Division, pursuant to the *Companies Acts of* 1867 and 1877, which authorized, in general terms, a reduction of capital if sanctioned by the court. Upon the authority of *In re Denver Hotel Company*, [1893] 1 *Ch.* 495 indicating that any such reduction must be made ratably in respect of all stockholders, approval was refused in the Chancery Division and the Court of Appeal affirmed. The House of Lords reversed holding that the power existed under the *Companies Act* to make the reduction and that the petition should be approved, since nothing inequitable or unfair in the proposed arrangement was shown. The Lord Chancellor said:

"I do not see any danger in the conclusion that the Court has power to confirm such a scheme as that now in question or any reason to doubt that this was the intention of the Legislature. The interests of creditors are not involved, and I

think it was the policy of the Legislature to entrust the prescribed majority of the shareholders with the decision whether there should be a reduction of capital, and if so, how it should be carried into effect. The interests of the dissenting minority of the shareholders (if there be such) are properly safeguarded by this: that the decision of the majority can only prevail if it be confirmed by the Court. This is a complete answer to the argument, ably urged by Mr. Romer at the Bar, that if all the shareholders of the same class were not dealt with in precisely the same fashion, the interests of the minority might be unjustly sacrificed to those of the majority.

"There can be no doubt that any scheme which does not provide for uniform treatment of shareholders whose rights are similar, would be most narrowly scrutinized by the Court, and that no such scheme ought to be confirmed unless the Court be satisfied that it will not work unjustly or inequitably. But this is quite a different thing from saying that the Court has no power to sanction it."

Even allowing for the difference in procedure under the *English Companies Acts*, under which judicial approval must precede the consummation of the reduction, we think this holding a persuasive precedent. The power to purchase shares of stock at private sale for retirement may, like other corporate powers, be abused; but the existence of that possibility does not deny the existence of the power.

Plaintiffs' arguments are really directed to the wisdom of the legislative policy clearly set forth in the statute. In the case of a statute expressed in vague or ambiguous language, such considerations may cast light upon legislative intent and may be given weight; here there is no room to doubt the intent, and no occasion to discuss questions of policy.

■ For the reasons set forth, we are of opinion that *Section 28* of the *General Corporation Law* confers upon a corporation existing under it power to reduce capital by purchasing shares for retirement at private sale, without a pro rata offering to all holders of stock of the class affected.

II. Was the power to purchase the Mathieson stock inequitably exercised?

Plaintiffs make two arrangements directed to this question.

First, it is said that the sole purpose of the purchase of the Mathieson shares was to eliminate a block of stock and prevent

its being offered in the open market or otherwise disposed of, and that the statute may not lawfully be used in furtherance of such a purpose. Two cases are cited in support of this argument, *Starring v. American Hair & Felt Co.*, 21 *Del.Ch.* 380, 191 *A.* 887 (affirmed *per cur.* 21 *Del.Ch.* 431, 2 *A.2d* 249), and *Greene v. E. H. Rollins & Sons, Inc.*, 22 *Del.Ch.* 394, 2 *A.2d* 249. In the *Starring* case Chancellor Wolcott had before him a charter provision purporting to authorize the redemption of common stock. Invoking this provision, the corporation sought to compel certain stockholders to surrender their stock, and one of them objected. In holding the provision contrary to law the Chancellor observed that what was attempted in that case was in effect a reduction of capital by retiring the shares held by some stockholders while allowing the remaining stockholders to keep their shares; whereas the provisions of *Section* 28 required such a reduction to be made by drawing the necessary number of shares by lot for retirement. The soundness of the decision is not questioned, but it is of no aid to plaintiffs. The Starring case dealt with a compulsory retirement of shares; the instant case concerns a purchase from a stockholder willing to sell. These two methods of reducing capital are distinct, and the statutory provisions governing them are different. The Starring decision is inapplicable.

*Greene v. Rollins, supra,* in which the Chancellor reaffirmed the observation in the Starring case, above mentioned also involved a charter provision for the compulsory sale of stock to the corporation. The principal question was whether such a provision was an unreasonable restraint on alienation. This decision is likewise not in point here.

We see no sound reason why it should be held as a matter of law that the method of reducing capital by purchasing shares at private sale for retirement may not be invoked simply because the purpose or motive of the reduction is to eliminate a substantial number of shares held by a stockholder at odds with management policy, provided of course that the transaction is clear of any fraud or unfairness. This was substantially the situation which was presented in the British and American case, supra, and which was found by the House of Lords to be no deterrent to approval of the purchase.

Our conclusion is that the purchase in the instant case was not, as a matter of law, illegal because of its purpose.

The second contention of plaintiffs directed to the issue of unfairness is founded upon a charge that at least two of the directors voting for the purchase, whose votes were necessary for a quorum, did so for selfish reasons, that is, to protect their positions and salaries; and that their action was not in the best interest of the corporation, since no benefit has accrued to it from the purchase. This contention is in effect an attack on the good faith of the directors' action and thus raises an issue of fact. Plaintiffs filed no affidavits in support of this contention, and the present record lacks any substantial evidence to support it. But we cannot resolve it here. On remand, plaintiffs will be at liberty to proceed to final hearing and adduce evidence directed to this issue, which must be determined by the Vice Chancellor in the light of the principles of law herein set forth.

The order of the court below of July 10, 1952, is affirmed, and the cause is remanded to the Court of Chancery of New Castle County for further proceedings in conformity with this opinion.