SEYMOUR PROPP,
Plaintiff,

*vs.*

HENRI SADACCA, THOMAS F. BENNETT, ALBERT GREENBERG, WIL-
LIAM R. HAMILTON, DAVID L. KALTMAN, WILLIAM V. LURIE,
LOUIS SZEL, JOSEPH H. WARD, ABRAHAM WOLF and NOMA
LITES, INC.,
Defendants.

*New Castle, November 11, 1961.*

*William E. Taylor, Jr.,* Wilmington, and *Abraham L. Pomerantz,* of Pomerantz, Levy & Haudek, New York City, for plaintiff.

*Louis J. Finger,* of Richards, Layton & Finger, Wilmington, and *Milton Kunen* and *Melvin A. Eisenberg,* of Kaye, Scholer, Fierman, Hays and Handler, New York City, for defendants.

*Max S. Bell, Jr. and Louis J. Finger,* Wilmington, and *Milton Rosenkranz,* of Walscheid & Rosenkranz, Jersey City, N. J., for defendant, David L. Kaltman.

MARVEL, Vice Chancellor: Plaintiff, a holder of 4,860 shares of the common stock of Noma Lites, Inc., claims that the defendant Henri Sadacca, who at the time of the transaction complained of was allegedly the owner of approximately eleven percent of the common stock of Noma Lites, Inc., had prior to such transaction gained effective control over the board of directors and officers of that corporation by means of his substantial stock holdings and the use made by him of his position of chairman of the board of directors. It is also contended, apparently as a result of such domination and control, that at the time of the filing of the complaint late in 1958 a large number of Mr. Sadacca's relatives and personal friends were employed by the corporation and that the compensation paid to such persons and to Sadacca was out of proportion to the value of such persons' services. Plaintiff goes on to allege that in the late summer of 1958, Textron, Inc., a large corporation with diversified interests, had decided on a plan to acquire the assets of American Screw Company, twenty percent of the stock of which was owned by a wholly owned Canadian subsidiary of Noma's. However, moves directed towards the taking over of the assets of American Screw Company by Textron, were effectively blocked by Noma, which had by November 26, 1958 purchased 51% of the stock of American Screw Company through its Canadian subsidiary. Textron, having several days earlier conceded defeat in this initial effort, meanwhile had set out to acquire a controlling interest in the stock of Noma and thereby accomplish indirectly what it had failed to do directly.

The complaint alleges that the directors of Noma reacted to Textron's plan [1] to purchase Noma stock by improvidently causing their corporation to borrow $3,000,000 at an exorbitant rate of interest, which funds were thereafter used for the purchase of 250,000 of its own shares in the open market. It is claimed that such frantic buying, surreptitiously carried on on two trading days late in November 1958, drove the price of Noma's stock from $9 up to about $13 per share and that such wasteful act was carried out for no proper corporate purpose, having been resorted to at great corporate expense solely in order to perpetuate Henri Sadacca's control of the affairs of Noma and to keep other persons subservient to him in office. Plaintiff concludes by alleging that the acts complained of, namely the improper and costly acquisition of allegedly unneeded Noma stock at a time when the corporation was already in financial difficulties, constitute a waste of corporate assets. He submits that such acts, not being subject to stockholder ratification, are actionable and prays for an order directing the individual defendants to account to their corporation for the injury thereby caused it.

The individual defendants, other than David L. Kaltman, concede in their answer that their corporation has generally lost money during the first six months of its fiscal year inasmuch as its business of manufacturing Christmas tree lighting normally prospers at year end. They deny, however, being parties to any wrongdoing in causing borrowed funds to be used by the corporation for the purchase of its own stock in November 1958. They admit that during the summer and autumn of 1958 Textron, Inc. had made various public offers to buy the stock of American Screw Company, a business in which Noma was vitally interested. They further contend that prior to Noma's purchase of its own shares as alleged in the

---

1. On Saturday morning, November 22, 1958 Mr. Sadacca found in his office, marked personal and confidential, a letter addressed to him by Royal Little, chairman of the board of Textron, asking for a list of stockholders and stating: "At the Textron directors meeting Wednesday, November 26, I am going to ask the Board to consider making an offer to purchase 472,143 shares (more than 50%) of the stock of Noma Lites, Inc. at $10 per share. Any such offer would be made on a basis where the first shares deposited would be taken up not on a pro rata basis * * *"

complaint "* * * Noma had reason to believe that Textron, for its own purposes and in derogation of the rights of Noma and its stockholders, was threatening to accomplish its purpose with respect to American Screw and/or the acquisition of its assets indirectly by obtaining control of Noma through purchases of Noma stock * * *" The defendant Kaltman by separate answer takes the position that in any event he should be absolved of liability for the alleged corporate injuries complained of because he "neither authorized, approved, ratified nor participated in any of the alleged actions by defendant Noma, by any of its officers, or by its board of directors which actions are the subject matter of the complaint."

Defendants' motion for summary judgment having been denied, the matters in dispute were thereafter tried and this is the opinion of the Court after final hearing.

Plaintiff takes the position that the holding of this Court in *Kors v. Carey,* 39 *Del.Ch.* 47, 158 *A.2d* 136, rather than supporting defendants' case, refutes it. He argues that while normally in the absence of fraud § 160 of *Title* 8 *Del.C.* permits a corporation to purchase its own stock unless so to do would impair the capital of the corporation, none of the factors which in that case satisfied the Court that the directors had properly caused a purchase by their corporation of a substantial number of its own shares exists in the case at bar. In Kors, it was found *inter alia* that the directors of Lehn & Fink, after due deliberation, had in a reasonable exercise of their business judgment applied corporate funds to the purchase of a large block of stock of their corporation for a proper purpose, namely to repel a clearly defined threat of injury to their corporation. Plaintiff contends that in the case at bar on the other hand there has been no showing that Textron posed a real threat to the welfare of Noma Lites and its stockholders but rather than Henri Sadacca in concert with a supine board manipulated the corporate machinery of Noma Lites in a wasteful manner for the improper purpose of retaining corporate control, thereby making not only himself but the entire board of Noma Lites liable for the corporate injury thus caused. Compare *Kingston v. Home Life Insurance Co.,* 11 *Del.Ch.* 258, 101 *A.* 898 and *Yasik v. Wachtel,* 25 *Del.Ch.* 247, 17 *A.2d* 309.

On receipt of Mr. Little's letter, Mr. Sadacca did not reply to it nor did he await Mr. Little's next overture which might conceivably have been an action of mandamus for the purpose of gaining access to the stockholder list he wanted, the purchase of Noma stock in the market, or some other action. Instead, on Monday, he went into the market for Noma shares. In the course of two trading days, namely Monday, November 24, and Wednesday, November 26, Mr. Sadacca purchased 199,100 shares of Noma at an average price of $11.67 per share. The precise details of these purchases are difficult to unravel because not only did the state of Mr. Sadacca's health cause his absence at trial but his lack of fluency in the English language prevented him from expressing himself clearly during his pre-trial examination. It appears, however, that Mr. Sadacca probably did not make the purchases under attack in the name of Noma because of the obvious effect such disclosure would have on the market. Moreover, despite Mr. Sadacca's ambiguous testimony on deposition as to his instructions concerning the original purchase slips for the stock it does not appear that either broker through whom the purchases were made believed that Mr. Sadacca himself was the actual buyer. It is quite clear, however, that the extraordinary transactions complained of were carried out not only without board authorization but without the knowledge of the corporation's president or that of any other member of the board, at least until Wednesday, November 26.

Early Tuesday morning, November 25, Mr. Sadacca met Mr. Little and the treasurer of Textron at breakfast, and after a brief and superficial advancement of a proposal that Mr. Sadacca sell out to Mr. Little's interests at a price of twenty dollars per share, a proposition in which Mr. Little evidenced no interest, it appears that Mr. Sadacca disclosed that on the previous day he had caused over 100,000 shares of Noma to be purchased and that he intended to continue to purchase more stock "to protect our company". The meeting evidently quickly broke up, and on the following day Mr. Sadacca brought his purchases of Noma stock up to 199,100 shares.

At the conclusion of this busy week in the affairs of Noma Lites, Inc., a week which included final consummation of the purchase by

Noma's subsidiary of a 51% interest in American Screw Company, a special meeting of the board of directors of Noma Lites, Inc. was called for Saturday morning, November 29, at 10:45 A.M. All of the individual defendants other than Mr. Lurie[2] attended such meeting along with several non-board officers and counsel. The facts concerning the defeat of Textron's efforts to acquire the assets of American Screw Company having been reviewed, the actual events of the past week concerning trading activity in Noma stock were disclosed by Mr. Sadacca who thereupon reported "* * * that in order to protect Noma against this new threat to itself and its investment in American Screw he had caused the corporation to purchase, on November 24th and November 26th on the American Stock Exchange, a total of 199,100 shares of the corporation's own common stock at a total cost of $2,322,896.41". Those present at such meeting, except for Mr. Sadacca, Mr. Kaltman and Mr. Wolf, testified as to their concern at such disclosure, it having been previously made to the president, Mr. Ward on Wednesday night and to Messrs. Hamilton and Lurie on Friday.

Notwithstanding the grave financial and policy implications of the disclosure, no alternate approach to the problem presented such as the personal assumption by Mr. Sadacca of responsibility for this large commitment, or the sharing of such obligation by other directors, was discussed, and the board proceeded to vote on a resolution approving and ratify the action taken by Mr. Sadacca in purchasing the shares "* * * in behalf of the corporation * * *" All members present voted in favor of the resolution except for Mr. Sadacca and Mr. Kaltman, the latter abstaining, according to the minutes of the meeting, because he had sold 4,800 shares of Noma "* * * during the period in which the corporation was making its purchases, although when he made these sales he had no knowledge that the corporation was buying its own shares * * *"

The purchase having been ratified, the board then proceeded to consider ways and means of raising cash in the amount of $2,500,000 for the purpose of not only paying for its newly acquired

2. This director testified at the trial that he was cognizant of Mr. Sadacca's decision before the meeting and approved it.

Noma stock but to complete payment on the purchase of the American Screw stock recently acquired for Noma's Canadian subsidiary. One possible loan plan at a large rate of interest having been rejected, counsel during the meeting continued to carry on loan negotiations by phone with A. J. Armstrong, Inc., a factor, and an agreement for a loan from such corporation was ultimately consummated. The terms of such loan provided for its payment on February 25, 1959 and it's being secured by a deposit of the purchased stock and other collateral, including an assignment of accounts receivable. It was also agreed that the loan would bear interest at the rate of one-thirtieth of one per centum per day.

The individual defendants first contend that Mr. Sadacca had actual as well as apparent authority to act for the corporation in the transaction under attack, in effect arguing that their act of ratification was redundant. Next, on the more reasonable assumption that such an extraordinary transaction as the purchase of 199,100 shares of stock and a concomitant commitment to pay out $2,322,890 from the corporate treasury is not the type of obligation normally negotiated by an executive officer without proper board authorization, the individual defendants take the position that the threat to Noma's stockholders posed by Mr. Little's letter justified ratification of the purchase. While such threat was stated in simple terms in the minutes of the meeting as "* * * this new threat to itself (Noma) and its investment in American Screw * * *" later during pre-trial; at the trial; and in their briefs defendants elaborated upon this theme.

During pre-trial, Mr. Little was referred to as a known liquidator, who might have, if he had acquired control of Noma, liquidated American Screw Company. It was also then contended and later argued on defendants' briefs that he might have, if not repulsed, divested American Screw from Noma. Later at the conclusion of the trial a number of exhibits were introduced by defendants which purported to establish that Mr. Little is in fact not only an unscrupulous businessman but has in fact despoiled Textron. However, although I am satisfied that at the November 29, 1958 meeting casual consideration was given by the directors to Little's reputation and to the fact that his offer was not on a pro rata basis, the testimony at

trial, in my opinion, brought into focus what appears to have been the basis for the decision of the board to ratify, namely that a default in payment to the brokers involved in the transaction could have, in the language of defendants' brief, "* * * put the corporation in financial jeopardy." In other words, faced with Mr. Sadacca's unilateral action, the board of Noma in the admittedly brief period granted it in which to act did not consider possible ways and means of coping with Mr. Sadacca's impulsive action beyond that of summarily making it the act of the corporation, a decision which apparently was not thereafter reviewed.

In *Kors v. Carey, supra,* on the other hand, there was apparently no immediate reaction to United Whelan's initial purchases of the corporate defendant's stock, and over a year elapsed between the time of United Whelan's acquisition of a substantial number of shares of Lehn & Fink Corporation in the spring of 1956 and March of 1957 when the directors of the latter corporation concerned at an eightfold increase in such holdings, initiated discussions with United's president concerning his intentions and business principles, particularly those pertaining to price rebates and the like. There followed a period during which the Lehn & Fink directors pondered ways and means of coping with United's potential bid for control in the light of the opinions of members of the staff of the Harvard Business School on what might be expected were United Whelan to succeed in its plan, and it was not until late in January 1958 that an opportunity to buy all of United's stock presented itself and was seized quickly. As noted above, however, there was nothing hasty or frantic about the ground work which preceded the decision. Furthermore, the price paid for the stock, namely $28 per share, was less than $3 per share above the highest prices at which the stock was sold in the then market. Finally, the burden of decision in a difficult case was eased by the presence of United Whelan as an active litigant.

The existence of advance planning in an analogous situation is also implicit in the opinion in *Martin v. American Potash & Chemical Corporation,* 33 *Del.Ch.* 234, 92 *A.2d* 295, 35 *A.L.R.2d* 1140, a case in which a reduction of capital brought about through a private

purchase of shares from a dissident stockholder was approved despite the obvious motive behind the purchase.

■ In the case at bar, on the other hand, the transaction complained of was consummated and approved without study as to whether or not a real threat of injury to Noma was in fact contained in Mr. Little's November 22, 1958 letter. In fact, so far as the record shows, the transaction complained of was completed before Textron had taken a single step to put its intentions about buying Noma stock into effect. And it is because of the precipitate and impulsive manner in which the transaction here under attack was consummated that I believe it should not be protected from plaintiff's purpose to present evidence as to possible damages to the corporation as a result thereof even though actual fraud on the part of the directors or any of them has not been clearly proved.

The statutory power granted to Delaware corporations to purchase shares of their own stock, a power found in most state laws, runs directly counter to the strict English rule on the subject and is for obvious reasons subject to abuse, particularly of the type likely to injure creditors.[3] Another possible misuse of such power lies in its use to juggle voting control and to buy off bona fide opponents of management, *Ballantine on Corporations* (*Rev. Ed.*) § 257 *and* 70 *Yale Law Journal* 308. On the other hand, as noted earlier, a thoughtful and honest decision of the board of directors to buy out

3. As stated by Judge Learned Hand in *In re Tichenor-Grand Co.* (*D.C. S.D.N.Y.*), 203 *F*. 720, 721: "If a corporation has received property into its treasury of the value of its authorized shares, that is no doubt subject to the vicissitudes of its enterprises, which will be represented by public knowledge of its success or of the value of its shares. If, however, it purchases its own shares, this affects neither the value of the other shares, the success of its enterprises, nor the amount of its apparent share capital. It is merely a method of secret distribution, against the deceit of which its creditors have absolutely no means of protection. The fund which they have the right to rely upon has been surreptitiously taken from them. It seems to me very little relief against the evils which such a right causes to limit it to cases where the corporation is thought to be solvent. It is a strange thing, I think, that there have been cases which permit the practice, which seems to me to be inevitably mischievous commercially."

a stockholder who threatens actual harm to his corporation has been sustained, *Kors v. Carey, supra.*

▮▮▮ I do not think that the facts here adduced at trial support a finding that the defendants responded properly to a situation requiring special care on their part. In the light of accepted principles of maximum freedom in the market place, the obvious dangers and abuses inherent in a corporation's[4] dealing in its own shares, and apart from any question of possible self-interest other than a normal desire to retain control, Sadacca first and the other voting directors later did not in fact as as required of them in dealing with a blunt business proposal advanced by Textron. Accordingly, in my opinion, the business judgment rule may not be relied on by defendants to bar plaintiff's attack on the actions complained of. I am satisfied that the proof offered at trial for the purpose of denigrating Royal Little and thus providing a reason for ratification was in large part collected ex post facto and that an insupportable corporate decision was reached in response to Mr. Little's proposition, the result of which by purpose or otherwise was to keep management in control. Utmost good faith and good judgment were required of defendants in the delicate field into which they were drawn following Mr. Sadacca's receipt of Mr. Little's proposal. The purchase by a corporation of its own shares is the type of transaction in which creditors or stockholders may be prejudiced even though the purchase be made in good faith, *Ballantine on Corporation (Rev. Ed.)* § 256 *et seq.,* 35 *Columbia Law Review* 971 and *Fletcher, Cyclopedia Corporation (Perm. Ed.) Vol. 6A,* § 2845 *et seq.,* the purchase of its own stock by a corporation notwithstanding the statute being an extraordinary act. In the case of *Brophy v. Cities Service Co.,* 31 *Del.Ch.* 241, 70 *A.2d* 5, 8, a case concerned with trust concepts controlling the proper use by an employee of knowledge gained by him of the fact that his corporation intended to purchase its own stock for the purpose of causing a market rise, the Chancellor stated:

4. See *In re International Radiator Company,* 10 *Del.Ch.* 358, 92 *A.* 255, *Pasotti v. United States Guardian Corporation,* 18 *Del.Ch.* 1, 156 *A.* 255 and *Hegarty v. American Commonwealths Power Corporation,* 20 *Del.Ch.* 231, 174 *A.* 273.

"The acquisition of its own capital stock is not ordinarily an essential corporate function."

Accordingly, each case in which the purchase by a corporation of its own stock is attacked must be considered on its own facts. Assuming that self-interest *per se* was not a significant factor in the decision of the defendant directors here, nonetheless they did not in my view of the evidence act in this instance in a manner which entitles them to protection from plaintiff's demand for an accounting. I conclude therefore that plaintiff should have the opportunity of offering proof that the corporate defendant was in fact damaged as a result of the action complained of. In so deciding I find that Mr. Sadacca had neither express authority by by-law or otherwise to act for the corporation in the transaction complained of, nor did he have apparent authority to bind the corporation to the purchase of 199,100 of its own shares on the basis of his past handling of corporate affairs including the defense of Noma's interest in American Screw Company.

As to Mr. Kaltman, it must be pointed out that insofar as can be determined from the record he abstained from voting in good faith because he honestly believed that if he were to become involved in consideration of Mr. Sadacca's purchases, his duties as a director would somehow come in conflict with his own self-interest because of his contemporaneous sale of Noma stock in a rising market. On the basis of all the relevant facts of record concerning Mr. Kaltman (which are admittedly sketchy because of his serious illness and inability to testify) I conclude that he is not legally responsible for the transaction under attack, it not being the type of corporate act for which a director may clearly be held liable unless he positively makes known his opposition thereto. Compare *contra* § 174, *Title* 8 *Del.C.*

On notice an order may be submitted directing an accounting of the matters complained of from all of the individual defendants other than Mr. Kaltman.