JOHN F. YASIK,

*vs.*

HARRY WACHTEL and DIAMOND STATE BREWERY, INC., a corporation of the State of Delaware.

*New Castle, Jan.* 13, 1941.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Henry M. Canby, Jr.,* for complainant.

*E. Ennalls Berl,* of the firm of Southerland, Berl, Potter & Leahy, and *David F. Anderson,* for defendants.

THE VICE-CHANCELLOR: Complainant charges that the issuance to Harry Wachtel of 58,400 shares of the voting stock of Diamond State Brewery, Inc., a Delaware corporation, was in violation of the pre-emptive rights of the shareholders, including complainant, and was otherwise in fraud of their rights in that the stock was issued for an inadequate consideration and for the purpose of wresting control of the corporation from the former majority shareholder. The relief asked is that the shares be delivered up for cancellation.

The defendant company was incorporated in April, 1933. Its authorized capital stock was and is 800,000 shares of class A stock of the par value of $1, and 200,000 shares of class B stock of the par value of 25 cents. The class B shares alone have voting rights. Complainant owns twelve shares of this class.

Upon its organization, the corporation issued certain class A shares and a total of 125,000 class B shares to Guy de la Rigaudiere, one of its principal promoters or to his nominees. Mr. de la Rigaudiere died in February, 1934, and about 105,000 shares of this stock passed to his widow. Mrs. de la Rigaudiere, in the latter part of 1935 or early 1936, contributed 20,000 shares to the corporation to be used to stimulate sales of the class A stock, but kept the remaining shares, about 85,000, which represented voting control.

Shortly after its organization, the corporation bought from Joseph Stoeckle Brewing Company a property which had some time previously been used as a brewery. For this it paid $40,000 in cash and gave two mortgages, one in the amount of $100,000 and the other $10,000. Lack of capital seriously handicapped the development of the corporation. By the early part of 1935 it had not more than about one-third of the equipment necessary to produce beer, and prac-

tically nothing had been done to make the brewery ready for production.

In November, 1934, defendant Watchtel was employed by the corporation to sell its capital stock. He entered into a contract with the corporation in March, 1935, which provided that he should be the sole salesman of 140,000 shares of class A stock for which he should be allowed a commission of thirty-five per cent of the selling price of the stock. Wachtel worked diligently, not only to obtain stock subscriptions, but generally to put the corporation on its feet. Finally, after an up-hill struggle, the corporation began to produce beer in the fall of 1936.

The corporation entered into other agreements with Wachtel. By a contract dated October 14, 1936, he was employed as general manager of the corporation and his compensation for his services in this capacity was fixed at twenty-five cents for each barrel of beer sold. On November 4, 1937, a contract was executed under which Wachtel was made the sole salesman of an additional 150,000 shares of class A stock, with a commission of twenty-five per cent of the price received for the stock sold.

Two resolutions of the board of directors and another agreement between Wachtel and the corporation concern specifically the shares of stock sought to be cancelled in this suit. On September 14, 1936, prior to the general managership contract and the second contract for the sale of class A stock, a resolution was adopted:

"* * * that a contract be drawn and executed between the Brewery and Mr. Harry Wachtel, giving unto the said Mr. Wachtel the right and privilege for one year to buy or sell all or any part of the remaining shares of class B stock, authorized and unissued, of the Diamond State Brewery, Inc., amounting at the present time to approximately Sixty Thousand (60,000) shares, to any person, partnership, or corporation, including himself, and that said stock be sold for a sum which will net to the said corporation Twenty-five ($.25) Cents per share, minus a 35% commission that the said Wachtel is entitled to receive in the sale of stock of the said corporation."

Pursuant to this resolution, an agreement was executed on December 28, 1936. It recites that there had been issued approximately 140,000 shares out of the 200,000 authorized of class B stock, and continues:

"Whereas, the said Wachtel has been acting as Sales Manager for the said corporation for a period of several years, and has been directly responsible for the success of the Brewery; and

"Whereas, the said corporation believes that it is to the best interest of the corporation to give unto the said Wachtel the right and privilege for a period of one year to sell or buy said remaining shares of class B stock.

"Now, therefore, be it hereby agreed, for and in consideration of these presents, and in further consideration of the services rendered by the said Wachtel and the agreements heretofore made between the said parties:

"1. That the said Wachtel shall have the sole and exclusive right and privilege for one year to buy or sell all or any part of the remaining shares of class B stock authorized and unissued of the said corporation, amounting at the present time to approximately Sixty Thousand (60,000) Shares to any person, corporation or partnership, including himself.

"2. That the said Sixty Thousand (60,000) shares of class B stock shall be sold for a sum which will net to the said corporation Twenty-Five ($.25) Cents per share, minus a Thirty-Five (35%) Per Cent commission that the said Wachtel is entitled to in the sale of stock of the said corporation.

"It is agreed that the said corporation shall receive Sixteen and one-quarter ($.16-¼) Cents net per share, irrespective of the price received by the said Wachtel in the sale of the said class B stock."

The minutes of a directors' meeting on May 4, 1937, contain the following:

"Mr. Wachtel presented a statement showing that the Brewery was indebted to him as of Sept. 30, 1936, in the sum of $9,490.00, and requested payment of that amount in either stock or cash. Mr. Errigo moved that Mr. Wachtel be paid for services rendered with class B stock, and that Mr. Wachtel be given a certificate for 58,400 shares of B stock. Motion seconded by Mr. Dangel. Motion passed. Mr. Wachtel agreed to accept payment in stock."

On May 24, 1937, the corporation issued to Wachtel 58,400 shares of class B stock.

At the stockholders' meeting in February, 1936, Mrs. de la Rigaudiere voted approximately 85,000 shares for the election of Messrs. Dangel, Errigo, and·Conley as directors. She voted her shares for them at the 1937 meeting, but testified that she did not know whether she then voted the same number of shares, and would not say whether it was approximately the same number. Wachtel owned no B stock at the time of the 1936 meeting; owned about 13,000 shares at the 1937 meeting; owned 99,074 shares at the 1938 and 1939 meetings and voted them in favor of the same directors originally elected by Mrs. de la Rigaudiere.

Complainant first attacks the issuance of the 58,400 shares to Wachtel on the ground that it was in violation of the then class B shareholders' pre-emptive right to subscribe to the shares, since they were not first offered to such shareholders. While some authorities hold that the pre-emptive right may exist with respect to original authorized capital stock as distinguished from an increase of authorized capital, the right does not come into being .until the original issue or offering has been terminated; and thereafter applies only to a new issue or offering. *Kingston v. Home Life Ins. Co.,* 11 *Del. Ch.* 258, 101 *A.* 898. Compare *Dunlay v. Avenue M. Garage & Repair Co.,* 253 *N. Y.* 274, 170 *N. E.* 917. Here, the issuance of the 58,400 shares cannot reasonably be considered a new issue. The corporation, from its beginning long past the date of Wachtel's acquisition, was continuously in need of capital and continuously offered and issued its class A shares. On April 17, 1933, the corporation's directors at their first meeting adopted a resolution that the company enter into a contract with Mr. de la Rigaudiere for the sale of all of the then unissued shares of both A and B stock, "giving the said Guy de la Rigaudiere a call thereon" at stated prices. For some time its stock was sold in units of four A shares and one B share. Approximately 15,000 shares of B stock were issued between the date when Mr. de la Rigaudiere acquired 125,000 shares and the date

of the resolution authorizing the contract to sell 60,000 shares to Wachtel.

The plan of the corporation from its inception was to issue all of its authorized capital stock, and it has not been shown that this plan was changed. There is some testimony of statements made by Wachtel and the directors that 60,000 shares of class B stock would not be sold; but I find this testimony unconvincing. The circumstances surrounding the corporation, particularly its desperate and unceasing need for capital for its initial enterprise and the continued sale of both classes of stock, negative the suggestion that any number of class B shares were set aside not to be issued until some later time. Complainant acquired his stock on September 22, 1933, after the directors' authorization of the sale of all the unissued B shares to Mr. de la Rigaudiere. The corporation made no representation respecting the shares then unissued upon which complainant relied to his detriment or disadvantage. Accordingly, he has no pre-emptive right to subscribe for these shares. *Kingston v. Home Life Ins. Co., supra.*

Complainant also contends that the 58,400 shares were issued to Wachtel without sufficient consideration and should therefore be cancelled. The resolution of September, 1936, and the contract pursuant thereto purport to authorize Wachtel to "buy or sell" the remaining class B stock, "to any person * * * including himself." The price to be received by the corporation is fixed at twenty-five cents per share, less a commission of thirty-five per cent; and the more reasonable construction of the resolution and contract is that the corporation should receive the same amount whether Wachtel bought or sold the shares. At the directors' meeting on May 4, 1937, when Wachtel presented a statement of indebtedness "as of Sept. 30, 1936" and requested payment in stock or cash, the corporation did not have enough cash to pay any substantial part of the indebtedness. The directors determined "that Mr. Wachtel be paid for

services rendered with class B stock." The shares were issued and the corporate indebtedness to him reduced at the price fixed by the September, 1936, resolution and December, 1936, contract: the par value less thirty-five per cent.

This indebtedness to Wachtel consisted of commissions due him upon sales of A stock, including stock issued to the mortgagee in payment of interest in arrears. It is not seriously denied that the amount of indebtedness asserted was due. Nor is the rate of the commission assailed as excessive. The rate is the same as that allowed in the original contract relating to the sale of A stock. Complainant's chief objection, as I understand it, is "that the corporation in cancelling his debt is paying him a commission for the privilege of issuing class B stock to him, and to make the deal more inequitable, the debt itself arose as a result of accrued commissions."

This is hardly an accurate summation of the transaction. The commission on the B stock is authorized by the September, 1936, resolution and December, 1936, contract. Under these, Wachtel could have acquired the shares whether or not the corporation was indebted to him in May, 1937. On the other hand, his delay in collecting earned commissions and acceptance of stock instead of cash relieved at least to some extent the pressure on the corporation for cash.

The essential question then is whether the consideration fixed by the 1936 resolution and contract is sufficient. With respect to par value stock, it is the duty of directors to authorize its issuance only for property equalling its full par value. *Bodell v. General Gas & Electric Corporation*, 15 *Del. Ch.* 119, 132 *A*. 442. Manifestly, this rule does not prevent the payment of reasonable commissions to selling agents for marketing stock, and it would seem that the allowance of commissions, provided it be not a mere guise to conceal evasion of the rule, is not rendered objectionable by the fact that it is made applicable to purchases by the agent himself as well as sales to others. The December, 1936, agreement

recites that Wachtel "has been directly responsible for the success of the brewery"; and the stated consideration includes "the services rendered by the said Wachtel." Thus, it will be helpful to review in some detail what services Wachtel actually performed.

In the spring of 1935, the financial condition of the corporation was indeed precarious. Real estate taxes were four or five years overdue. Arrearages of mortgage interest exceeded $6,000 and the mortgagee threatened foreclosure. The corporation was far from ready to produce beer. The only substantial source of funds was from the sale of stock. Wachtel found that such sale was impeded by the fact that the corporation was not yet operating although its stock had been offered and sold for over two years. Wachtel carried on negotiations with the mortgagee and obtained extensions of time for the payment of interest. When later the arrearages were nearly $9,000, he persuaded the mortgagee to forgive one-half of the sum due and to accept payment in stock for the balance. In the spring of 1936 when interest was again in arrears, it was Wachtel who negotiated with the mortgagee to postpone collection of the amount then due until such time as the corporation should be able to pay dividends. It was he who persuaded the mortgagee to reduce the interest rate from six per cent to four and one-half per cent, and this reduction has since continued in effect. Wachtel arranged for the payment of overdue taxes in installments. He negotiated and obtained credit in purchasing brewery equipment. He procured the services of an architect on credit. He negotiated loans from a local bank.

It is not too much to say that Wachtel's efforts were largely responsible for the establishment of the corporation as a going concern. Until he was made general manager he was employed by the corporation solely to sell stock, and for that period received no other compensation than commissions on stock sold. His other services resulted in substantial benefits to the corporation and were of such value as to

furnish full consideration—and justification—for the contract allowing a commission at the same rate whether he bought or sold the unissued class B shares.

Complainant says that the issuance of the class B stock to Wachtel "was for the purpose of placing him, either alone or in conjunction with the directors, in control of the corporation, and was for the purpose of depriving Mrs. de la Rigaudiere of her voting control, and the stock should therefore be cancelled." It is fundamental that directors stand in a fiduciary relation to the corporation and its shareholders, and that their primary duty is to deal fairly and justly. It is a breach of this duty, wholly apart from any consideration of pre-emptive rights, for directors to make use of the issuance of shares to accomplish an improper purpose, such as to enable a particular person or group to maintain or obtain voting control, against the objection of shareholders from whom control is thereby wrested. *Kingston v. Home Life Ins. Co.*, 11 *Del. Ch.* 258, 101 *A.* 898; *Bowen v. Imperial Theatres, Inc.*, 13 *Del. Ch.* 120, 115 *A.* 918; *Elliott v. Baker*, 194 *Mass.* 518, 80 *N. E.* 450; 11 *Fletcher Cyc. of Corporations*, § 5160, *pp.* 317-320; 19 *C. J. S., Corporations*, §§ 794-796, *pp.* 174-177.

After considering the evidence with reference to Wachtel's acquisition of the 58,400 shares of B stock, I am inclined to accept as true his testimony that he had no agreement or arrangement with the directors that they would participate in the ownership or voting of the shares.

Assuming, as complainant contends, that the directors' purpose in issuing the shares was primarily to take from Mrs. de la Rigaudiere and give to Wachtel voting control, how has this complainant been injured? He never exercised voting control, either alone or with any group or faction. He could exercise no more control while Mrs. de la Rigaudiere with 85,000 shares was the majority shareholder, than he could after Mr. Wachtel acquired 99,074 shares. Certainly, a shareholder in complainant's position would have

no right to insist that control remain in any person, if such person should consent or waive his rights to object to action depriving him of control. As stated above, there has been no violation of the pre-emptive right to subscribe to shares in order to preserve proportionate voice and influence in the selection of corporate management; and the consideration for the shares issued to Wachtel has been found adequate. Furthermore, his ownership of voting control has not been shown to have resulted in mismanagement of the corporation, or in the conduct of its affairs in a way occasioning loss or disadvantage to the shareholders generally. In this state of facts, any injury from the issuance of the shares would be a wrong, not to every shareholder, but solely to the person deprived of control. It follows that this complainant has not been injured, and only those whose rights have been violated may be heard to protest.

A decree dismissing the bill of complaint will be advised.