158 A.2d 136 (1960)
Bertha KORS, Plaintiff,
v.
Paul CAREY, James M. Boohecker, Chandler Cudlipp, David M. Freudenthal, James W. Newman, Edward Plaut, Walter N. Plaut, Walter E. Sachs, B. A. Tompkins, United Whelan Corporation and Lehn & Fink Products Corporation, Defendants.
Court of Chancery of Delaware, New Castle.
February 18, 1960.
*137 William E. Taylor, Jr., Wilmington, and Louis Kipnis, New York City, for plaintiff.
Robert H. Richards, Jr., of Richards, Layton & Finger, Wilmington, and Patterson, Belknap & Webb, New York City, for defendant, Lehn & Fink Products Corp., and the individual defendants.
Berl, Potter & Anderson, Wilmington, and William M. Kaplan, New York City, for defendant, United Whelan Corp.
MARVEL, Vice Chancellor.
The complaint herein as amended not only charges the directors of Lehn & Fink Products Corporation with the allegedly improper act of using corporate rather than personal funds for the purchase of 60,200 shares of Lehn & Fink stock from United Whelan Corporation as well as the separate corporate act of purchasing the assets of National Laboratories, Inc. at an excessive price, but also complains of collusive dealings between representatives of these two corporations in negotiating and consummating the stock purchase under attack. However, plaintiff conceded at trial that she would be unable to sustain her charge of collusion and further agreed to the dismissal of her cause of action concerning the purchase of the assets of National Laboratories, Inc. Thus, plaintiff's case at trial was confined to efforts to establish that the action of the Lehn & Fink directors in negotiating and consummating the purchase with corporate funds of 60,200 shares of their corporation's stock was legally improper. United Whelan, having in the meantime not only answered but cross-claimed, remains in the case as an active litigant seeking affirmative relief on its cross-claims. On a first cross-claim based on an allegation of fraud it seeks rescission of the stock sale to Lehn & Fink together with damages. It takes the position that a second cross-claim based on an alleged partial failure of consideration for the controversial purchase and sale of Lehn & Fink stock should be stayed pending disposal *138 of plaintiff's New York suit for damages brought under § 16(b)[1] of the Securities Exchange Act of 1934, and in a third cross-claim it seeks damages from the individual defendants for their alleged breaches of fiduciary duty in concealing the identity of their corporation as the actual purchaser of the 60,200 Lehn & Fink shares held by United Whelan.
The transaction which plaintiff attacks and which the seller seeks to rescind resulted from a contract consummated in February 1958 in which Lehn & Fink's identity was not disclosed. The contract provided for the purchase and sale of 60,200 shares of Lehn & Fink at $28 per share. The other basic financial facts about the transaction are as follows. On February 3, 1958, the date of the contract, Lehn & Fink stock was selling in small lots on the New York Stock Exchange at $25½ per share, and at $26¼ per share on the date of consummation of the sale. A brokerage fee of fifty cents was paid on each share so acquired. Since the purchase complained of the shares in question have been retained by the corporation as treasury stock. In recent months issued shares of stock of Lehn & Fink have been traded on the New York State Exchange at prices ranging from $45 per share to $48 per share.
Plaintiff contends that the Lehn & Fink purchase of its own shares was not only not made for a proper corporate purpose but was improperly consummated at an unreasonable price per share approximately 10% in excess of the market in a transaction which involved the spending of allegedly excessive amounts for a brokerage commission, legal fees and other outlays connected with the decision to eliminate the threat to management posed by United Whelan's ownership of a substantial block of Lehn & Fink stock. In order to consummate the purchase moneys were borrowed, but at the same time the number of issued shares outstanding was reduced and dividend requirements curtailed. However, as plaintiff points out, as a result of the transaction Edward Plaut's position as a large stockholder of Lehn & Fink (at present he holds 66,621 shares) was substantially enhanced percentagewise.
Plaintiff seeks an accounting for the loss allegedly caused the corporation as a result of the purchase complained of, and while also praying for an order requiring the corporation to sell the stock in question, did not either at trial or in her briefs picture such ultimate relief as immediately desirable.
Lehn & Fink Products Corporation is an established manufacturer of cosmetics and household drugs. It makes a number of popular cosmetics under the trade names of Dorothy Gray and Tussy as well as a disinfectant known as Lysol, which products are distributed by independent retail drug stores and drug store chains to which Lehn & Fink makes direct sales. One of Lehn & Fink's principal outlets is the fashionable firm of Lord & Taylor.
As of March 16, 1956, United Whelan had acquired 5,800 shares of the capital stock of its supplier, Lehn & Fink. By December 1956 United's holdings had risen to 20,100 registered shares together with a substantial block held in street names. Record holdings by United of such stock continued to rise to a total of 45,600 shares by March 1, 1957, at which point concern of Lehn & Fink's management about such holdings had increased to the point that in the absence from the country of Lehn & Fink's president, Edward Plaut, David M. Freudenthal, a director, conferred with United's president, Charles Green, who indicated that United's fixed policy was to eschew ordinary retail cosmetics business methods for the more immediately remunerative one of *139 dealing with manufacturers on special terms, thus reasserting a controversial business policy[2] which had been aimed at but resisted by Lehn & Fink in the past. No demand was made by Green for board membership or the like, however, no form of working agreement between Lehn & Fink and its supplier was reached, and meanwhile United continued to accumulate Lehn & Fink stock until at the end of 1957 it held 60,200 shares or approximately 16% of the 400,000 shares of issued and outstanding stock of such corporation.
United Whelan, a substantial customer of Lehn & Fink's, operates a large chain of drug stores, many of its newer ones being operated on a self-service basis. The chairman of its board and its largest stockholder, Charles Green, has waged a number of proxy fights against the managements of a variety of business enterprises, in several of which, including a 1951 one for control of United Whelan, he had been successful. While his purpose in causing United Whelan to buy Lehn & Fink stock was not fully disclosed to United's stockholders until enough of the former's stock had been accumulated to cloak United's bid for power with authority, his actual purpose in buying heavily into Lehn & Fink, namely to gain control, was conceded by Mr. Green at trial.[3]
The individual defendants have advanced a number of reasons for their decision to acquire United Whelan's stock, including the unlikely one of a desire to have stock available for the acquisition of desirable business assets notwithstanding the existence of 600,000 authorized but unissued shares which could be utilized for such a purpose. I conclude after consideration of the testimony and an examination of the material exhibits adduced at trial that the real basis for the decision to eliminate United as a stockholder (a decision which crystalized slowly but which was apparently inevitable as early as mid-1956 when United Whelan's steady accumulation of Lehn & Fink stock became obvious) is found in a fundamental divergence in these two corporations' business policies. The record clearly demonstrates that no middle ground for accommodating the views of United Whelan with those of the incumbent management of Lehn & Fink could possibly be found. It was accordingly apparent very early in the game that one or the other of these two opposing forces must necessarily give way either voluntarily or as a result of a battle for control, and what appear to me to be the compelling reasons for the decision to buy out United find their roots in a firm resolve to preserve management policy and independence and an established relationship with customers as such had been developed over the years by past and present directors of Lehn & Fink. For instance, it is contended by the individual defendants, and there is evidence to sustain the contention in principle, that for a substantial customer of Lehn & Fink to have continued to hold a large number of shares of stock of that corporation would have tended to alienate Lehn & Fink's other chain store customers, who, it is claimed, must in order to survive, avoid dependency on the whims of a competitor for adequate supplies of name cosmetics for the promotion of which substantial sums of money have been committed. A variation of this same fear of customer dissatisfaction is found in the views of the directors of Lehn & Fink's that United Whelan did not measure *140 up to Lehn & Fink either in its finished product or in business principles, and that to have United's voice dominant in the affairs of Lehn & Fink would inevitably not only be injurious to the latter's sales but would, because of Green's aggressive principles, which emphasize flexibility and experimental change in corporate purpose, perhaps threaten Lehn & Fink's very existence as an expanding manufacturer of high quality cosmetics. Lehn & Fink's directors were also concerned not only about the chance of being led into a course of conduct involving possible violations of the Robinson-Patman Act by reason of United's insistence on special promotional schemes but also about the need of being required in self-protection to prepare for the possibility of an anti-trust action against United Whelan under § 7 of the Clayton Act[4] on the theory that as a customer it could not lawfully be in a position of being able through stock ownership to influence Lehn & Fink's policy. In brief, a comparison of the over-all business record of United Whelan, including its earnings and how they were achieved (as well as those of other corporations in which Charles Green is a dominant force), with that of Lehn & Fink's demonstrated that the continuance of United Whelan as a dominant force in Lehn & Fink posed a serious threat to the welfare of the latter corporation and its stockholders.
Plaintiff, in answer to these contentions, derides the motives of the individual defendants, pointing out that Lehn & Fink's aging president and dominant management stockholder, Edward Plaut, is concededly desirous of having his son succeed him in office and that in greater or lesser degree all of the Lehn & Fink directors have an interest in retaining management in office. Plaintiff argues that Lehn & Fink's directors, on learning of United's continuing purchases of stock, became the victims of unreasoning panic, imagining that the possible loss of a proxy fight would somehow spell the end for Lehn & Fink, when actually the only matters thereby placed in jeopardy were defendants' selfish interests, plaintiff insisting that the purchase complained of was made secretly and surreptitiously for the improper purpose of retaining jobs and control of corporate power. Plaintiff insists that under the circumstances disclosed at trial any buying out of United Whelan's stock should have been made by means of a spending of personal rather than corporate funds by the individual defendants.
There is no doubt, however, about the right of a Delaware corporation in a proper case to purchase, hold, sell and transfer shares of its own capital stock provided the spending of its own funds in any such transaction does not cause an impairment of its capital, § 160 Title 8 Del.C.,[5] and no contention is made that the purchase here attacked to any extent did so. Plaintiff, while conceding that statutory authority exists, strenuously contends that such power has been abused. She cites a number of leading cases which are concerned with situations in which the spending of corporate funds by corporate officers for the purpose of securing or retaining corporate control have been condemned, relying principally on Macht v. Merchants Mortgage & Credit Co., 22 Del.Ch. 74, 194 A. 19, and Anderson v. Albert & J. M. Anderson Manufacturing Co., 325 Mass. 342, 90 N.E.2d 541. Plaintiff's proof, however, in my opinion fails to establish a case of fraud, misconduct or abuse of discretion such as would compel a court of equity to find the individual defendants guilty of a breach of their fiduciary duty and cause the purchase in question to be declared to have been made for no proper corporate purpose, and while the numerous authorities cited by plaintiff on *141 the high degree of fairness required of directors vis à vis the stockholders are, of course, controlling in principle, each case of so-called breach of fiduciary duty must be decided on its own facts. Obviously, manipulation of corporate machinery so as to cause the issuance of shares for the sole purpose of maintaining or retaining control of a corporation is improper, Yasik v. Wachtel, 25 Del.Ch. 247, 17 A.2d 309, and cases therein cited. In Macht v. Merchants Mortgage & Credit Co., supra, and its companion cases, charges of criminal manipulation on the part of one Ades for the purpose of obtaining corporate control rather than a dispute over policy were involved. In other words, directors, while bound to deal with stockholders as a class with scrupulous honesty, may in the exercise of their honest business judgment adopt a valid method of eliminating what appears to them a clear threat to the future of their business by any lawful means, McPhail v. L. S. Starrett Co., 1 Cir., 257 F.2d 388. Thus, it is established in Delaware that directors may validly spend corporate funds for the defense of corporate policy in a proxy fight, Hall v. Trans-Lux Daylight Picture Screen Corp., 20 Del.Ch. 78, 171 A. 226. Furthermore, a reduction of capital through the purchase of shares at private sale is not illegal as a matter of law simply because the purpose or motive of the purchase is to eliminate a substantial number of shares held by a stockholder at odds with management policy, "* * * provided of course that the transaction is clear of any fraud or unfairness. * * *", Martin v. American Potash & Chemical Corp., 33 Del. Ch. 234, 92 A.2d 295, 302, 35 A.L.R.2d 1140.
Faced with these principles in a suit which in essence seeks to impugn a corporate decision to preserve an established management's business policy, plaintiff has labored diligently in pre-trial, at trial, and in her briefs to establish that the individual defendants in authorizing the purchase complained of were not only guilty of misconduct but also abused their discretion, Bankers Securities Corporation v. Kresge, D.C.Del., 54 F.Supp. 378. However, I am satisfied that not only has no fraud been established but that plaintiff has failed to carry the burden of proving any misconduct or abuse of discretion on the part of the Lehn & Fink directors. While the actual decision to buy out United Whelan was arrived at quickly late in January 1958, the factors which went into the decision had been carefully weighed and evaluated over the preceding months during which various methods of coping with United's potential bid for control were under more or less constant discussion by board members not only inter sese but with professional experts such as members of the faculty of the Harvard Business School and officials of Georgenson & Co., proxy solicitors. Without regard to the many bits of questionable evidentiary information which appear in the record, there is no doubt in my mind but that the business methods of Charles Green, which stress liquidity, the spending of substantial sums for aggressive promotional schemes, and a readiness to sacrifice an established mode of doing business for quick profits, presented a threat of a possible future business course which was entirely at odds with Lehn & Fink's traditions. In short, my opinion is that the action of the board in authorizing the purchase complained of in a transaction in which the identity of Lehn & Fink as the buyer was not fraudulently concealed is legally unassailable by a minority stockholder on grounds of fraud, misconduct or abuse of discretion. Furthermore, under the circumstances presented, neither the price paid per share nor the commission allowed the broker in a private transaction, were in my opinion unreasonable, and the other expenses involved in preparing for the final show-down with Mr. Green cannot be said to be excessive. They are in fact modest compared to the moneys which would have been required to defend management policy in an all-out proxy fight.
As to plaintiff's contentions that the Lehn & Fink directors were selfishly voting for the retention of their offices and *142 the emoluments thereof, I conclude, having heard the testimony of the principals involved and considered their personal evaluation of the dilemma posed by the existence of a substantial block of their stock in the hands of United Whelan, that plaintiff has not succeeded in overcoming the presumption that directors form their judgment in good faith, Allaun v. Consolidated Oil Co., 16 Del.Ch. 318, 147 A. 257. While it appears that the five active members of Lehn & Fink's management currently receive salaries ranging from sums in excess of $35,000 per annum to Mr. Edward Plaut's of slightly more than $100,000 per year, that consultant directors receive compensation ranging from $3,200 to $12,100 and that substantial legal fees have been paid to lawyer-directors, I find no evidence that a selfish desire to retain jobs on the part of the non-managerial Lehn & Fink directors was a factor in their decision. Furthermore, assuming that Edward Plaut, who had most at stake in preserving the status quo at Lehn & Fink, was strongly influenced by family considerations in reaching his decision, nonetheless I am not persuaded that he so dominated the board that its non-managerial members were unable to make their own decisions about the purchase under attack.
Finally, even assuming that the purpose of all the individual defendants was primarily a selfish desire to retain control and jobs through the device of negativing United Whelan's potentiality by a buying out, how has plaintiff been injured? United Whelan, having by its sale patently waived its opportunity to seek control, plaintiff, who never exercised voting control alone or with any group or faction cannot under the rationale of Yasik v. Wachtel, supra, and the facts of record, successfully claim any injury to the shareholders generally as a result of the transaction complained of. On the contrary, the record discloses a substantial increase in value on the part of Lehn & Fink's traded shares since February 1958, an appreciation which is reflected, of course, in the market value of the treasury shares involved in this litigation, and there is no evidence of mismanagement or the like on the part of the incumbent board since these shares were acquired and the possibility of a Green-controlled board eliminated. While plaintiff vigorously contends that the buying out deprived the general body of stockholders of their right to make a choice between the type of management which they might have expected to receive from a board under the influence of Mr. Green as opposed to the incumbent board, the franchise to vote in corporate elections is basically an individual right to vote directly or cumulatively, Maddock v. Vorclone Corporation, 17 Del.Ch. 39, 147 A. 255, and no more. There being no voting trusts or pooling agreements here involved, it necessarily follows that United Whelan having voluntarily sold stock which might have been the basis for a proxy battle, plaintiff has no possible basis for complaining about a so-called lost opportunity to vote for a Green sponsored management. To be sure the opportunity was lost, however, in losing the opportunity plaintiff and those in her class were deprived of no rights. Judgment for the individual defendants will be entered on the issue of director liability raised in the complaint and answer.
On the other hand does United Whelan, having by its voluntary action of selling its Lehn & Fink stock lost its chance to make a bid for corporate control and also having foregone a substantial corporate gain as a result of the transaction it seeks to rescind, have any grounds for complaint?
United Whelan, which stood by from February 8 when the fact of the Lehn & Fink purchase was disclosed until August 20, 1958, before taking affirmative legal action by way of its cross-claim for rescission, insists that it has been the victim of over-reaching on the part of Lehn & Fink and is entitled to a decree of rescission. To be sure, as noted above, United apart from its surrender of a chance to bid for control of Lehn & Fink, has as a result of its disposal *143 of that company's stock on a rising market lost out on a capital gain substantially in excess of the one it actually realized. It is naturally desirous of over-turning the basic transaction here involved and of re-establishing itself as the owner of 60,200 shares of greatly appreciated stock, however, it disregards the principle that directors generally do not occupy a fiduciary position vis à vis individual stockholders in direct personal dealings as opposed to dealings with stockholders as a class (see Annotation 84 A.L.R. p. 615, and DuPont v. DuPont, D.C.Del., 242 F. 98, at page 136), failing to recognize that it is only in special cases where advantage is taken of inside information and the like that the selling stockholder is afforded relief and then on the basis of fraud, Northern Trust Co., v. Essaness Theatres Corp., 348 Ill. App. 134, 108 N.E.2d 493, and Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853. Here, there is no showing of fraud, United glossing over the fact that not only is its president, Charles Green, skilled in the art of evaluating securities, a skill which he applied to the Lehn & Fink acquisition, but the further fact that Lehn & Fink through its agent made no representations whatsoever. This case is clearly not one in which a buyer possessed with special knowledge of future plans or of secret and untapped resources deliberately misleads an ignorant stockholder, but one in which a knowledgeable seller made its own decision to sell to an undisclosed buyer which did nothing but preserve its anonymity.
The steps leading up to the consummation of the sale need not be discussed in detail. Suffice it to say that Lehn & Fink which had been preparing since mid 1956 for an ultimate show-down with United authorized its broker to consummate the purchase after negotiations which followed an initial suggestion of a willingness to sell on the part of United. To be sure United did not know the identity of the buyer, but it made no inquiry of Lehn & Fink, choosing to sell notwithstanding such non-disclosure and notwithstanding the possibility of incurring liability under § 16 of the Securities Exchange Act because of its short term position in Lehn & Fink stock. The actual nature of the transaction, namely one arrived at after arms' length bargaining, is revealed by Charles Green's candid testimony at trial: "* * * I made a deal. Good or bad, I made a deal and that was the end of the deal * * *"
The contract sought to be rescinded was made in New York, but regardless of its situs it is not subject to rescission because there is no proof of fraud or even of innocent misrepresentation. In other words, United has failed to sustain its pleaded defense that Lehn & Fink's broker deliberately caused United to believe that the purchaser of the stock in question was someone other than Lehn & Fink. Had the agent falsely represented that Lehn & Fink was not the buyer (and I am satisfied that United would not have sold had it known such to be the fact), such a representation would have no doubt created a cause of action, Kelly Asphalt Block Co. v. Barber Asphalt Paving Co., 211 N.Y. 68, 105 N.E. 88, L.R.A.1915C, 256, and Standard Steel Car Co. v. Stamm, 207 Pa. 419, 56 A. 954. However, the agent made no such misrepresentation; the seller agreed to the buyer's terms of sale, and for a variety of reasons, including general market conditions, the purchased stock rose in value. Lehn & Fink, the purchaser, had no fiduciary or other duty in the transaction (there being no showing that the buyer had any special knowledge about the possibilities of appreciation in the market value of the purchased stock which was not basically available to the seller) other than to live up to its contract which it did. In other words, this is a case in which there is neither proof of fraud, nor of actionable wilful concealment, Houston v. Hurley, 2 Del.Ch. 247, but also no proof of a false statement innocently made, Eastern States Petroleum Co. v. Universal Oil Products Co., 24 Del. Ch. 11, 3 A.2d 768.
*144 It would unduly extend this already lengthy opinion to discuss United's contentions at greater length. Suffice it to say I am satisfied that not only has it no right to rescind the transaction complained of in the light of the facts and circumstances surrounding the sale, but its contentions concerning a so-called failure of consideration because of possible liability under § 16(b) of the Securities Exchange Act are, in my opinion, without merit, and I shall decline to stay action on United's cross-claim based on such theory. I so decide because the record is clear that United as a result of its deep involvement as a stockholder of Lehn & Fink and despite knowledge of the risks involved in a sale of stock it had held less than six months, nevertheless ran the risk that a stockholder of Lehn & Fink might seek to bring it to account for its statutory breach. Any judgment it may ultimately be forced to pay as a result of the New York action would be the same had it sold its Lehn & Fink stock to a third party. If recovered, such judgment will not affect the purchase price, being entirely statutory in nature. In short, United, for reasons which have not been fully disclosed and which in any event are not relevant to the outcome of this case, made a voluntary decision to divest itself of its Lehn & Fink stock. Any losses suffered by it to date or any judgment entered in the future against it because of such sale can only be attributed to its own actions and not to those of Lehn & Fink. In view of my conclusion that United's cross-claims are without merit I shall not consider the parties' contentions as to laches.
On notice, orders may be submitted dismissing both the amended complaint and United Whelan's cross-claims, and entering judgment for the individual defendants.
NOTES
[1] This section, 15 U.S.C.A. § 78p, is designed to discourage insider profits on short term sales of securities by authorizing a suit for recovery of the seller's profits for the benefit of the issuer of the securities in question in the event such a sale is established.
[2] The Robinson-Patman Act., 15 U.S.C.A. § 13, makes it illegal for a manufacturer to give, or for a retailer knowingly to receive, rebates and allowances not made available to all competing customers of the manufacturer on proportionally equal terms.
[3] "A. Because we didn't think we had to (reveal the Lehn & Fink investment to stockholders of United). When you are playing poker you don't show your hand, do you? At that time  if you are looking for the information I think you are, we'll help you  we were thinking of accumulating enough stock to buy the control of Lehn & Fink, if that's what you want to bring out." Tp241.
[4] 15 U.S.C.A. § 18.
[5] Such power has been seriously questioned in the absence of a statute such as § 160 Title 8 Del.C. on the basis of English precedents, Ballantine on Corporations (Rev.Ed.) §§ 256 through 258, Compare Hamor v. Taylor-Rice Engineering Co., C.C.Del., 84 F. 392.