190 A.2d 524 (1963)
Anne J. MATHES and Harry Lewis, Plaintiffs,
v.
P. T. CHEFF et al., Defendants.
Court of Chancery of Delaware, New Castle.
April 23, 1963.
William E. Taylor, Jr., Wilmington and Sidney L. Garwin and Samuel M. Koenigsberg, Newark, for plaintiffs.
David F. Anderson, of Berl, Potter & Anderson, Wilmington, for the individual defendants other than John D. Ames.
Irving Morris, Wilmington, for defendant Holland Furnace Company.
MARVEL, Vice Chancellor.
The complaint in this action, which was filed derivatively in February 1958 by two stockholders of Holland Furnace Company, charges that during September and October 1957 said corporation was improperly caused by its directors to purchase 181,400 of its own shares of capital stock "* * * in order to perpetuate the control of the corporation by the individual defendants at a time when said funds could have been used for other business purposes to benefit Holland * * *" It is also charged in the complaint that the principal purchase complained of, namely the acquisition of 155,000 of Holland shares from the named defendant Motor Products Corporation, "* * * was not made in order to further any business purpose or interest of Holland * * *" but "* * * in order to benefit the individual defendants * * *" See Bennett v. Propp (Del.Sup.Ct.) 187 *525 A.2d 405. In other words, while a number of reasons are advanced by the individual defendants to justify the purchase of its own stock by Holland, namely, overcapitalization, employee unrest arising out of the prospect of a change in management, the need to acquire stock for a contemplated stock option plan, and finally the elimination of an alleged threat to Holland's very existence because of the acquisition by Motor Products Corporation of a substantial number of shares of Holland stock, plaintiffs contend that corporate funds were in fact used by the individual defendants for the purpose of keeping incumbents in office although non-corporate funds were available for such purpose. Because of the excessive amounts paid for the stock so acquired plaintiffs claim that Holland was damaged in an amount in excess of $900,000.
To begin with, it is readily apparent that the purchase by Holland of its own shares in the summer and fall of 1957 was not in itself a novel corporate practice on Holland's part. Furthermore, purchases by a corporation of its own stock are expressly authorized by Title 8 Del.C. § 160. As far back as July 28, 1953, the board of directors of Holland had adopted a resolution authorizing the purchase by the corporate president of Holland stock in a total amount not to exceed $200,000. The market price of the stock was relatively low at the time and it evidently appeared to the directors that an opportunity was then ripe for the purchase of such stock not only for the purpose of reducing the company's dividend requirements but so as to have stock available for "* * * proper corporate purposes * * *" Another factor entering into the decision to make such purchases was that the corporation had adequate working capital and funds covering all contingencies. Over the course of the following year some 12,800 of its shares were purchased by Holland but thereafter such purchases were carried on in a sporadic manner until the late summer of 1957, after it had become apparent that substantial purchases of Holland stock were being made on the New York Stock Exchange by a person or persons not associated with Holland's management. The complaint goes on to charge that on learning at the end of August 1957 that Motor Products Corporation, by then the holder of 100,000 shares of Holland or over 11% of its issued stock, intended to take an active part in the affairs of Holland and that a proxy fight might be in the offing, a policy of again purchasing its own shares was adopted by Holland, 1900 shares having been purchased between August 23 and August 29. Such course of action culminated on October 24, 1957, upon consummation of the transaction which plaintiffs principally attack, namely the purchase by Holland Furnace Company of 155,000 shares of its own stock from Motor Products Corporation. It is alleged that this latter purchase was made at a price of $14.40 per share, whereas during the week ending October 25, 1957 Holland stock had sold on the market at prices ranging between $10.375 and $11.50 per share. It is further alleged that shortly after such purchase Holland stock was traded on the open market at prices of $10 or less and that the basic transaction complained of was accordingly consummated at great financial loss to Holland and at a corresponding financial gain to Motor Products. The relief prayed for is rescission of the purchase from Motor Products and an accounting by the individual defendants and Motor Products "* * * for their profits and for Holland's damages resulting from the acts and transactions herein alleged * * *"
The case having gone to trial in the absence of Motor Products Corporation, a corporation of the State of New York, the preliminary relief now sought after trial is a judgment against the individual director defendants holding them jointly and severally liable for the damages allegedly caused to their corporation as a result of the transactions complained of.
Holland Furnace Company, a pioneer manufacturer of hot air furnaces and air *526 conditioning equipment, maintains its main plants and principal office in Holland, Michigan, its home since its founding in the early part of the present century. From this central point it sells its products direct to consumers through some four hundred branch offices and numerous smaller offices situated in forty-three states. The employees of the branch offices not only install Holland's products in the customer's house but also provide maintenance service. In other words, the organization purports to operate a large, integrated business in which there are no intermediate dealers. Notwithstanding Holland's growth over the years, in the period immediately preceding the transactions complained of, its sales and earnings had decreased and its marketing methods had been made the subject of serious charges levelled against it by the Federal Trade Commission.
The defendant P. T. Cheff, who has been executive head of Holland since 1933, is the husband of the defendant Katherine Cheff, whose father was not only one of the founders of the company but the inventor of the basic Holland furnace. Mrs. Cheff is a lady of substantial means and in giving her testimony by deposition she evinced a strong resolve that her interest and that of members of her family in Holland Furnace Company should be maintained to the fullest extent possible. The defendant Landwehr, who is also the child of a founder of Holland and a nephew of Mrs. Cheff's, retired as a corporate executive in 1951 but thereafter remained on the board of directors. The defendant Trenkamp is counsel for Holland but was not at the time of the matters complained of on a fixed retainer. Fees received by him from the company over recent years range from $19,700 in 1953 to $68,750 in 1957, the average amount received by him over the years being in the neighborhood of $50,000 per annum. Over the same period Mr. Cheff was paid a president's salary of $77,400 a year plus a special annual allowance of $5,000. Neither Mrs. Cheff nor Mr. Landwehr at the time of the transactions complained of were paid any salaries or fees by the corporation other than the amounts paid each director for scheduled board meetings.
All of the above named directors were also stockholders of Holland, Mr. Cheff owning 6,000 shares and Mrs. Cheff 5,804 shares. In addition, Mrs. Cheff held a 48% interest in Hazelbank United Interests, a family corporation which was the holder inter alia of approximately 165,000 shares of Holland out of 886,584 shares issued and outstanding as of March 31, 1957. The defendant Landwehr was not only a Hazelbank stockholder but also the holder of 24,010 shares of Holland. Finally, Mr. Trenkamp was the holder of 200 shares of Holland.
The other directors, Ames, Boalt and Spatta each owned 200 to 300 shares of Holland but received no compensation from the corporation other than a fixed fee of $200 paid to each director for each board meeting held whether he attended or not. Inasmuch as Hazelbank, the family corporation alluded to above, held 164,950 shares of Holland, the total holdings of such corporation added to those held individually by the Cheffs and Edgar P. Landwehr at the time of the transaction complained added up to 200,764 shares or approximately 24% of Holland's issued stock. Beginning late in June 1957, activity in the listed trading of Holland stock increased substantially. Whereas monthly totals of stock traded in had ranged from 10,000 to 25,000 shares in the early part of the year, during the period June 24 through June 28, 37,800 shares were dealt in. No doubt as a result of such activity the price per share rose to $12.00, a high for the year.
In July over 65,000 Holland shares were bought and sold, and at a July 30 meeting of the directors of Holland the board for the first time learned from the defendant Ames that the principal buyer of such shares had been Arnold H. Maremont, a Chicago industrialist, who as of that date had acquired some 55,000 shares of Holland through his instrumentality, Motor Products *527 Corporation. Thereafter, on August 23, Mr. Maremont visited Mr. Cheff and informed him that Motor Products had acquired a total of 100,000 shares of Holland and suggested that he be made a Holland director. This request was rejected and at the earliest opportunity Cheff caused Holland to engage in active buying of its own stock, 1900 shares having been purchased by August 29. On August 30, the Holland board met and a resolution was adopted to the effect that a stock option plan would be desirable for key employees and authorizing the president of the corporation to purchase up to 71,000 shares for such a plan at prices not to exceed $16.50 per share. Recent purchases by officers of the corporation of 4,900 shares of stock for the corporation's treasury account were also ratified. Thereafter, early in September, the defendant Staal was not only directed to set up a $500,000 corporate fund to be applied to the purchase of Holland stock but was also authorized by Mrs. Cheff to buy a like amount of stock for her individually she having in her own words "* * * put in a half a million dollars in it and I would have put more and I will * * *"[1]
On September 9, 1957, Mr. Staal, who had been placed in charge of the stock acquisition plan, wrote to Merrill Lynch, brokers in New York, authorizing such firm to act as agent for Holland and for Mrs. Cheff in the purchase of Holland stock in even proportions but adding that "* * * It is our thought to purchase a total of approximately $1,500,000 in additional stock and that eventually this will be proportioned one-third each to Mrs. Katherine Nystrom Cheff, Holland Furnace Company and Hazelbank United Interests, Incorporated". In the meantime, Mr. Maremont continued to show an interest in Holland, writing to each director on September 13 with emphasis on his status as a substantial investor in Holland. He noted that in his opinion Holland was not exploiting its potential adequately in that notwithstanding intervening commodity price increases, Holland's sales volume had declined from $41,000,000 in 1948 to $31,000,000 in 1956 and its earnings from $4,000,000 to $495,000 in the same period. He recommended that a broad engineering survey be made for the benefit of all stockholders. In the meantime, Holland and Mrs. Cheff had each acquired 23,100 additional Holland shares, and by the end of September Motor Products had added 31,200 Holland shares to its holdings, the total purchases made by all three parties during the month of September totalling 78,800 shares or about 85% of the total shares of such stock traded in for the month. As might be expected, the price of the stock rose, reaching a high of $16 1/8 per share, the highest reached in over two years. On September 25, both Mrs. Cheff and Holland discontinued purchases of Holland stock but not until Holland had spent some $380,000 on its stock acquisition program.
On September 30, 1957, Maremont wrote a letter to Mrs. Bowles, a niece of Mrs. Cheff, a sister of the defendant Landwehr and a stockholder of Hazelbank, in which he referred to an earlier conversation and suggested alternate proposals concerning the immediate future relationship of Motor Products to Holland, the essence of such proposal being that Motor Products either sell its Holland stock to Hazelbank and members of Mrs. Bowles' family or that Motor Products purchase 250,000 shares of Holland stock from the latter group. Following receipt of this proposal, Mrs. Bowles and her sister, Mrs. Putnam, were then urged by Mr. Trenkamp, a member of the board of Hazelbank, to have Hazelbank buy more Holland stock. However, they declined to have the corporation borrow for such purpose. Mr. Maremont's proposal was then presented to the Hazelbank board at a formal meeting and referred by the board to the finance committee for study and its recommendation. The next board meeting of Hazelbank was tentatively set for October 17. Significantly, *528 Mr. Landwehr in his capacity as vice-president of Hazelbank promptly responded to Maremont's proposal by letter and telegram and alluded to the fact that final action on Motor Products' proposals would be taken at an October 17 meeting. And while efforts were made by defendants at trial to play down the part played by Hazelbank in the negotiations over Motor Products' position in Holland stock, I am satisfied that when Mr. Trenkamp and Mr. Staal went to Chicago to meet with Mr. Maremont on October 14 to discuss the possibility of acquiring his Holland stock, they were authorized to speak not only for Holland Furnace but for Hazelbank and Mrs. Cheff individually as well. Furthermore, when Mr. Maremont was informed on October 16 that his offer to sell his Holland stock would be accepted it was not known by those acting not only for Holland but also for members of the Cheff and Landwehr family exactly how Motor Products' stock in Holland would be acquired, although it would appear that in any event it was then contemplated that Holland would purchase one half of the Holland shares held by Maremont. On October 19, a letter to such effect was addressed to the New York Stock Exchange. On the same date, Mrs. Cheff signed a letter as president of Hazelbank calling a special meeting of the board for October 23 to consider action on a proposal to purchase not only "* * * a substantial number * *" of Holland shares held by Motor Products but also to consider buying out the interests of Mrs. Bowles and of Mrs. Putnam in Hazelbank. However, prior to the meeting of the board of Hazelbank on October 23rd the Holland board had met and resolved to buy Motor Products' 155,000 shares of Holland at a price of $14.40 per share, the closing price of the stock on the previous day having been $11. The president, Mr. Cheff, opened the meeting with a statement to the effect that an investigation prior to Mr. Maremont's visit to the Holland plant in August had "* * * disclosed that he was primarily interested in the liquidation of companies in which he and his associates obtained a controlling interest * * *" A full discussion followed and it being the consensus of the directors that the alternative to buying Motor Products' stock would be a costly proxy fight, the purchase was approved. Other factors discussed prior to the vote as being reasons for acquiring the stock in question were that such purchase would have the beneficial effect of lowering dividend requirements, thus offsetting interest payments on the moneys required to be borrowed to make the purchase. It was the further view of the directors that the purchase would not in any way curtail the operations of the corporation or its recently organized subsidiary finance company and would have a calming effect on key personnel who might leave Holland if a contest for control should develop. All directors voted for the purchase other than Mr. Spatta who was absent but who, according to Mr. Cheff, expressed his approval by phone during the course of the meeting. No mention is made in the minutes of a stock option plan.
Unfortunately the individual defendants, Mrs. Cheff,[2] Mr. Ames, Mr. Boalt and Mr. Landwehr did not testify at trial, and whether or not Mrs. Cheff made it entirely clear to the October board meeting that she would purchase all or half of the Holland stock held by Motor Products Corporation is most difficult to determine on the present record. In other words, I do not think that the appearing individual defendants other than Mr. and Mrs. Cheff and Mr. Landwehr and Mr. Trenkamp can be said on the present record to have fully and clearly understood either prior to or at the October 23 meeting that an alternative to using borrowed corporate funds for the purpose of buying out Motor Products Corporation existed.
In short, the defendants Ames, Boalt and Spatta[3] (who were neither salaried officers *529 nor substantial stockholders of Holland) were not members of the Cheff-Landwehr family group and did not have an important stake in the affairs of Holland. Furthermore, they were neither officers nor directors of Hazelbank and so were not, according to the papers before me, present during meetings at which ways and means of preserving dominant family influence in the affairs of Holland Furnace Company were considered. The other directors, on the other hand, either because of close personal and business contacts, particularly through the family corporation, Hazelbank, could not have helped but be aware of the fact that not only had Mrs. Cheff either individually and/or through Hazelbank made at least a tentative commitment to purchase a half to two thirds of the Motor Products stock but were also aware that a capability existed on the part of Mrs. Cheff[4] and/or Hazelbank to take title to all of the stock which Holland had been caused to acquire between the end of August and October 23, 1957.
These latter defendants strongly urge that the record supports their contentions that the purchases of Holland stock which plaintiffs attack were made for valid reasons, citing Kors v. Carey (Del. Ch.) 158 A.2d 136 and a number of Delaware cases to the effect that directors of a Delaware corporation are presumed to act honestly and for the best interests of their corporation. However, I have concluded that while the purchases under attack were not made without any color of right as was the case in Bennett v. Propp, supra, nonetheless, the actual purpose behind the purchases of its own stock made by Holland Furnace Company beginning in late August 1957 and culminating on October 24, 1957, was to preserve corporate control in the hands of interested incumbents. In short, the contrary evidence adduced by defendants lacks conviction. The intrusion of Mr. Maremont into the affairs of Holland was not shown to carry with it the threat that Holland would as a result be caused to commit illegal business acts as was the case in Kors v. Carey, supra. Furthermore, there is no substantial evidence that Mr. Maremont's purpose in causing Holland stock to be purchased by Motor Products was the first step in a plan to put Holland out of business. Employee unrest as of the time of the transactions complained of can as well be attributed to the condition of Holland's business affairs as to Mr. Maremont's purchases of Holland stock. More to the point, only one important employee was shown to have left and his motive for leaving is not clear. As to defendants' claim that the purchased stock was needed for a contemplated stock option plan, it appears that sufficient treasury stock[5] was available for an incipient option plan prior to the purchase from Motor Products. In any event, the market price for Holland stock having been driven artificially high, the time was hardly propitious for buying stock for an option plan, and as of the time of trial no such plan has been approved by Holland's board of directors.[6] The answer to defendants' contention that Holland was over-capitalized would seem to be that if an outlet was needed for Holland's capital an obvious place to put any excess was in its recently created subsidiary finance company, Heating Acceptance Corporation. Finally, the opinion of defendants' expert that the purchase of the stock in question at a price no greater than the net working capital per share represented sound business judgment in no way obscures the fact that *530 what Holland's management sought and gained as a result of the transactions under attack was the retention of corporate control. When corporate funds are used to buy out a threat to incumbents, directors are called upon to justify such spending. As was said in Bennett v. Propp, supra.
"We must bear in mind the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult. See the comments on the instant case in 62 Col.L.Rev. 1096, 1100. Hence, in our opinion, the burden should be on the directors to justify such a purchase as one primarily in the corporate interest. See 70 Yale L.J. 308, 317. They sustained that burden in the Kors case; they have not done so here."
Having concluded that the purchases here in issue were improperly made for the purpose of retaining corporate control, I am of the opinion that the defendants, P. T. Cheff, Katherine N. Cheff, Edgar P. Landwehr and Robert H. Trenkamp must account for any financial loss caused Holland Furnace Company as a result of the transactions complained of. However, for the reasons given above the complaint will be dismissed as to the other appearing individual defendants.
Order on notice.
NOTES
[1] Katherine Cheff deposition, p. 39.
[2] The defendant Ames, a nonresident, was not served and did not enter his appearance in this proceeding.
[3] Spatta, of course, did not attend the October 23 meeting.
[4] Between November 29, 1957 and January 10, 1958, Mrs. Cheff purchased 14,100 shares of Holland at prices ranging between $9 1/8 and $9 7/8.
[5] At the August 30, 1957 meeting of the directors of Holland, the purchase of 71,000 shares of Holland stock for an option plan was authorized. By September 25, 1957, Holland by reason of recent purchases had a total of 45,000 shares in its treasury.
[6] At a March 1958 board meeting an option plan was submitted but no action taken "* * * on recommendation of counsel because of the pendency of this litigation * * *" Transcript p. 268