# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE P3 HEALTH GROUP      )      Consol. C.A. No. 2021-0518-JTL
HOLDINGS, LLC      )

## ORDER DENYING IN PART AND GRANTING IN PART THE MANAGER DEFENDANTS' MOTION TO DISMISS COUNT V

1. Hudson Vegas Investment SPV, LLC ("Hudson") was a minority investor in P3 Health Group Holdings, LLC (the "Company"). In this litigation, Hudson has asserted various claims based on a transaction between the Company and a special purpose acquisition company, commonly known as a SPAC.

2. The defendants filed a surfeit of motions to dismiss on various grounds, including Rule 12(b)(6). The court has issued a decision addressing the breach of contract claims that Hudson asserted. Dkt. 172 (the "Contract Opinion," cited as "Op."). This order incorporates that decision by reference.

3. In Count V of its complaint, Hudson has asserted a claim for bad faith breach of contract against the "Manager Defendants," defined in the complaint as Abdou, Bacchus, Kazarian, Tolan, Garrett, Glisson, Leavitt, Leisure, and Price.

4. In Count V, Hudson asserts that the Manager Defendants committed a bad faith breach of contract by failing to act in good faith to facilitate Hudson's exercise of the Preemptive Option. The Contract Opinion held that Hudson did not state a claim for breach of the Preemptive Option. This claim for bad faith breach fails for lack of an underlying breach.

5. In Count V, Hudson asserts that the Manager Defendants committed a bad faith breach of contract by failing to act in good faith when making determinations regarding "Company Total Equity Value," "Fair Market Value," and "Pro Rata Share." Hudson has not articulated why determinations of Company Total Equity Value or Pro Rata Share were required. The claim for bad faith breach based on those issues fails to state a claim on which relief can be granted.

6. Hudson alleges that the Board failed to make a good faith determination of the Fair Market Value of the common stock of Foresight for purposes of distributing the merger consideration in accordance with the Distribution Waterfall, as required by Sections 4.1(b) and (c) of the LLC Agreement. Hudson alleges that the Board used a price of $10 per share at a time when the market price was $8.87 per share. Hudson alleges a series of other facts regarding the terrible performance of Foresight which supports a reasonable inference that managers acting in good faith would not have used a valuation of $10 per share. It is reasonably conceivable that the Manager Defendants committed a bad faith breach of Sections 4.1(b) and (c) of the LLC Agreement by failing to make a good faith determination of Fair Market Value, as required by the LLC Agreement.

7. Hudson alleges that the Manager Defendants acted in bad faith by selecting the SPAC partner that Chicago Pacific favored without any real effort to explore or evaluate other possibilities, and then proceeding with an unfair merger at an unfair price. This argument sounds like a claim for breach of fiduciary duty in contractual guise. *See Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018–19 (Del. Ch. 2010). The LLC

Agreement eliminates fiduciary duties for the members of the Board, leaving only contractual obligations. This claim for bad faith breach is dismissed because Hudson has not tied its allegations to a specific contractual obligation, whether express or implied.

8. Hudson alleges that the Manager Defendants engaged in a knowing, affirmative, and systematic campaign to sideline the Hudson Managers, exclude them from communications, deprive them of information, and prevent them from participating in the governance of the Company. As detailed in the Contract Opinion, the level of exclusion was extreme and supports an inference of intentional breach. Hudson has stated a claim against the Manager Defendants for bad faith breach of contract based on the exclusion of the Hudson Managers.

9. The Manager Defendants contend in response that dismissal is warranted because the LLC Agreement exculpates them from liability for any acts other than fraud. The pertinent provision provides:

> Except for any liability arising out of or resulting from a Manager's act of fraud as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction . . ., the personal liability of a Manager to any other Manager, the Company, or to any Member for any loss suffered by the Company or any monetary damages for breach of contract or breach of any duty (including any fiduciary duties, any and all such fiduciary duties having been eliminated pursuant to Section 5.6(b)) is hereby eliminated to the fullest extent permitted by the Delaware Act and any other applicable law. In furtherance of the foregoing and not in limitation thereof, each Manager shall not be liable for errors in judgment and may consult with and rely on counsel and accountants and any Member, Manager, Officer, employee or committee of the Company or any of its subsidiaries or other professional in respect of the affairs of the Company and shall in no event have any personal liability in respect thereof.

Ex. 1 § 5.7 (the "Exculpation Provision").

a.    As used in the Exculpation Provision, the term "fraud" is ambiguous. One possible interpretation is that it only means common law fraud—in the sense of a claim involving (i) a false representation; (ii) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (iii) an intent to induce the plaintiff to act or to refrain from acting; (iv) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (v) resulting damage to the plaintiff. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). That would be an exceedingly narrow carveout that would match up poorly with what managers do for an entity. Rather than providing a standard tailored to decisions that managers make when directing and overseeing an entity's business and affairs, the carveout would use a standard applicable to third parties who make affirmatively false statements (or, under some circumstances, who remain silent in the face of a duty to speak).

b.    Historically, "fraud" had a much broader meaning, and courts of equity used that term to encompass a wide range of misconduct. *See* 1 Joseph Story, *Commentaries on Equity Jurisprudence* § 186, at 200 (Melville M. Bigelow ed., Beard Books 2000) ("It is not easy to give a definition of Fraud in the extensive signification in which that term is used by Courts of Equity . . . ."). As Professor Pomeroy explained,

> It is utterly impossible to formulate any single statement which shall accurately define the equitable conception of fraud, and which shall contain all of the elements which enter into that conception; these elements are so various, so different under the different circumstances of equitable cognizance, so destitute of any common bond of unity, that they cannot be brought within any common formula. To attempt such a definition would therefore be not only useless, but actually misleading.

3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 873 at 420–21 (5th ed. 2002). Equitable fraud is broad enough to encompass "all willful or intentional acts, omissions, and concealments which involve a breach in either legal or equitable duty, trust, or confidence, and are injurious to another, or by which an undue or unconscientious advantage over another is obtained." *Id.* at 422. Equitable fraud is necessarily flexible "to allow courts of equity to address fraud in all its forms . . . ." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009); *see* Story, *supra*, § 190, at 202 ("Courts of Equity do not restrict themselves by the same rigid rules as Courts of Law do in the investigation of fraud, and in the evidence and proofs required to establish it.").

c.      When Delaware decisions traditionally deployed the term "fraud" in the context of cases involving the internal affairs of entities, the term carried its broader historic meaning. *See, e.g.*, *Kors v. Carey*, 158 A.2d 136, 141 (Del. Ch. 1960); *Equity Corp. v. Groves*, 53 A.2d 505, 507 (Del. Ch. 1947); *Hartford Accident & Indem. Co. v. W. S. Dickey Clay Mfg. Co.*, 21 A.2d 178, 184 (Del. Ch. 1941), *aff'd*, 24 A.2d 315 (Del. 1942).

d.      If the word "fraud" appeared in an anti-reliance provision, then the context would suggest that the parties meant common law fraud. In the Exculpatory Provision, the context suggests an intent to use "fraud" in its traditional sense, because that concept can encompass claims involving the types of acts that individuals take when managing an entity. A middle ground might involve the concept of "fraud" for purposes

of the Exculpation Provision extending beyond common law fraud to include knowing and intentional breaches of the LLC Agreement.

e.     Given the lack of a definition for fraud and the availability of several possible context-driven interpretations, the Exculpation Provision is ambiguous. The Exculpatory Provision may well prove dispositive during a later phase of the case. It does not provide a basis for a pleading-stage dismissal.

10.     Assuming for the sake of argument that the Exculpation Provision truly strives to exculpate the managers from liability in all situations except when they have engaged in common law fraud, then the provision goes beyond what the Delaware Limited Liability Company Act allows. Section 18-1101(e) does not permit an LLC agreement to "limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." 6 *Del. C.* § 18-1101(e). As discussed in the Contract Opinion, Hudson has stated a viable claim for breach of the implied covenant based on the exclusion of the Hudson Managers from the process of planning, developing, and negotiating the merger. Op. at 74. The facts supporting that claim are sufficiently extreme to support an inference that the Manager Defendants breached the implied covenant in bad faith. The Exculpation Provision does not bar Hudson from pursuing and recovering on that theory.

11.     The Manager Defendants' motion to dismiss Count V is therefore DENIED IN PART and GRANTED IN PART. The motion is denied as to Hudson's claims based on the Distribution Waterfall and the exclusion of the Hudson Managers from the Company's governance process. Otherwise, it is granted.

*/s/ J. Travis Laster*
Vice Chancellor Laster
November 1, 2022